LA MOTTE et al. v. UNITED STATES.

UNITED STATES v. LA MOTTE et al.

(Circuit Court of Appeals, Eighth Circuit. January 30, 1919.)

Nos. 5099, 5129.

1. INDIANS ⬤10—INDIAN LANDS—GRANTS—CONDITIONS.
   The United States, as owner of the fee of lands allotted to Indians, may impose such conditions as it sees fit in its grant to them.

2. INDIANS ⬤15(1)—LANDS—ALIENATION—RESTRICTIONS.
   The United States, as guardian of tribal Indians, may impose such restrictions on their alienation of lands allotted as may seem advisable for their protection and welfare.

3. INDIANS ⬤16(3)—LANDS—LEASES.
   Under First Allotment Act June 28, 1906, §§ 2–7, 12, held that the Secretary of the Interior is required to approve a lease of lands allotted under the statute and held by minors or other incompetent Indians, whether such lands came to them by allotment, descent, or devise, and whether the lease was arranged by a parent, guardian, or. administrator, who might or might not be a nonmember of the tribe, or an Indian certified as competent, or was approved by the state county court.

4. INDIANS ⬤16(3)—LANDS—LEASES.
   Under Osage Allotment Act, §§ 2–7, 12, where lands are held by tenants in common, part of whom are incompetent and part competent, or nonmembers of the tribe, a lease to be valid must be approved by the Secretary of the Interior; the remedy of the competent tenant being to secure partition in accordance with Act April 18, 1912, c. 83, § 6.

5. INDIANS ⬤16(3)—LANDS—LEASES.
   Under the Osage Allotment Act of June 28, 1906, held that, though restrictions as to alienation removed from surplus lands do not, where the lands have been conveyed or devised, etc., follow the land into whosesoever hands it may pass, yet a lease of lands owned by noncompetent Indians, to be valid, must be approved by the Secretary of the Interior, though it has come to them through descent, devise, or purchase from or through competent or nonmembers of the tribe.

6. INDIANS ⬤16(3)—LANDS—LEASES—FORMS.
   Under the Osage Allotment Act of June 28, 1906, which requires leases of the lands of noncompetent Indians to be approved by the Secretary of the Interior, and in view of section 12 declaring that all things necessary to carry into effect the provisions of the act shall be done, the Secre-

⬤For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

tary may prescribe a form of lease, and require that leases be executed in such form as a condition to his approval.

7. INDIANS ⬤➙16(3)—LANDS—AUTHORITY OF UNITED STATES.

Where a lease by an Indian allottee was approved by the Secretary of the Interior, and the lessee went into possession, the government is not concerned, and has no authority to protect the lessee from trespass by cattle, where the freehold is not injured, and the allottee lessor is not affected.

Appeal from the District Court of the United States for the Western District of Oklahoma; John H. Cotteral, Judge. ·

Bill by the United States against George G. La Motte and others. From the decree, defendants appeal, and complainant cross-appeals. Modified and affirmed.

T. J. Leahy and C. S. Macdonald, both of Pawhuska, Okl., for La Motte and others.

John A. Fain, U. S. Atty., of Lawton, Okl., and Redmond S. Cole, Asst. U. S. Atty., of Pawnee, Okl.

Before CARLAND and STONE, Circuit Judges, and ELLIOTT, District Judge.

STONE, Circuit Judge.   Cross-appeals from an injunction bill brought by the government against George G. and Anna Marx La Motte.   The purpose of the bill as revealed in the prayer was to prevent the La Mottes from—

"entering into any lease, of any kind or character, with any incompetent Osage Indian, and by any means or manner, other than that prescribed by the Secretary of the Interior; and that they be further restrained and enjoined from using, occupying, and exercising any control, and from assigning and subleasing any lands informally leased or acquired, as aforesaid, from any incompetent Osage Indian member of the Osage Tribe of Indians in Oklahoma, without first having complied with the rules and regulations of the Secretary of the Interior."

The basis of the bill was (a) that the La Mottes were dealing and intended to continue to deal in agricultural leases of lands of noncompetent Osage Indians without securing the approval of such leases or subleases by the Secretary of the Interior and without complying with the rules and regulations of the Secretary concerning such leases; (b) that in so doing and in placing their customers upon such lands they were interfering with and preventing the proper leasing of the lands by the Secretary in accordance with such rules and regulations; (c) that the placing of such customers upon these lands gave rise to numerous trespasses on such lands and also upon other land inclosed within the fencing of the lands so attempted to be controlled by them; (d) that it would require a multitude of suits by the government to prevent such trespasses and clear these lands of such intruders.

The modus operandi of the La Mottes is described as follows:

"That the defendants are pretending to be engaged in the business of leasing Osage Indian lands for the use of various and numerous persons, firms and corporations to graze cattle thereon, and for agricultural purposes. That the manner and means of procuring leases for use as aforesaid is, in

substance, as follows: That the said defendants will solicit various incompetent Osage Indians to execute a lease upon lands allotted to them, which said leases are not in the form prescribed by the Secretary of the Interior, but are informal, in that they do not comply with the provisions of Exhibit A [form of lease required by the Department]. That the defendants will continue to procure as many leases from as many allottees within a certain prescribed area until said defendants have, under the guise of said leases, obtained in their own name, or in the name of the person whom they represent, a body of land which they cause to be inclosed with fence, and denominate the same a 'pasture'; that this 'pasture' is then leased, or subleased, or contracted, to the person, firm, or corporation desiring the use of the same to graze cattle thereon and for agricultural purposes. That the said defendants charge said persons, firms, or corporations a large sum of money, and place said persons, firms, or corporations in possession of said land, and thereafter said lands are used by said persons, firms, or corporations, for grazing purposes and for agricultural purposes, the said defendants guaranteeing to said persons, firms, or corporations that they will pay all trespass money and all rentals, and that the defendants will assume all liability to the said persons, firms, or corporations that may be occasioned by the use and occupancy of the said lands as aforesaid; that it is not the intention, nor the custom of said defendants, to have said leases, so procured from said incompetent Osage Indians, signed, subscribed and sworn to before an officer of the Osage Indian Agency; neither is it the intention nor the custom to submit said leases to the Secretary of the Interior for his consent and approval; but that, on the contrary, immediately after the procurement of said leases as aforesaid, the said defendants, for a sum stated, proceed to place the person, firm, or corporation [designing] to use the said land, in possession.

"The plaintiff alleges that the defendants have, by the aforesaid manner and means, acquired informal leases from incompetent Osage Indians to the amount of approximately 25,000 acres of land, the exact number of which the plaintiff is unable to ascertain, but alleges that it is informed and believes that the number of acres so acquired will far exceed the amount of 25,000 acres. The plaintiff alleges that, for a number of years past, the defendants have procured, by the manner and means aforesaid, 'pastures' for H. M. Stonebreaker, T. P. Kyger, Lee Russell, Brown & Ellingwood, a partnership, R. H. Chowing, Thompson & Shipman, a partnership, Ross Heaton, and divers other persons, and have placed said persons and firms in possession, and have used and occupied lands belonging to incompetent Osage Indian allottees, for agricultural purposes and for grazing cattle, without complying with the rules and regulations of the Secretary of the Interior, as above set out, and without the knowledge or consent of the Secretary of the Interior, and that the defendants have established themselves in a permanent business conducted in the aforesaid manner, and are at the present time procuring, and will continue to procure, leases as aforesaid, for persons, firms, and corporations for the aforesaid purposes."

The bill also particularizes as to 26 described pieces of property so treated by them.

The answer admits the leasing of "lands in Osage County from Osage Indians and other people for grazing and agricultural purposes." It further says that it leases large bodies of land for grazing purposes adjacent to lands belonging to noncompetent Osage Indians and "that in order to lease their own lands * * * to cattle men who desire and demand large acreage, it is necessary for them to agree with such cattle men that they will protect and guarantee them from damages by reason of trespass upon such Indian lands. These defendants deny that they take possession of such lands or that they deliver possession to their own lessee of the same, but merely hold themselves liable for any trespass money that may be due on account

of stock running upon the same." The answer then deals with the specifically described tracts raising various questions concerning the authority of the Secretary over grazing and agricultural leases on Osage Indian lands in the different instances there illustrated. The answer concludes with a prayer:

"That the court declare and decree that these defendants may, without any violation of any authorized rules and regulations of the Secretary of the Interior, lease lands from the parents of minor Osages; also lands which are under the control of guardians and administrators duly appointed by the county court of Osage county, Oklahoma, and lands which are inherited by members of the tribe from deceased members of the tribe, even though such members do [not?] have certificates of competency, without conforming to the rules and regulations of the Secretary of the Interior concerning the leasing of Osage Indian lands, and that the court decree that the Secretary of the Interior has no authority under the law to promulgate rules and regulations concerning the leasing of lands of any of the members of the Osage Tribe of Indians and define and determine the authority of the Secretary of the Interior concerning the approval of farming and grazing leases of lands belonging to members of said tribe."

The decree of the court found that the following kinds of leases were invalid without the approval of the Secretary, to wit, of land of minor allottee by parents one of whom was a white nonmember of the tribe; of land of minor allottee by surviving parent, a white nonmember of the tribe; of land of minor allottee by parents after both of them had received certificates of competency under the Act of June 28, 1906 (34 Stat. 539, c. 3572); of land of minor allottee by father after receipt by him of such certificate of competency; of homestead allotment by competent Indian after receipt of certificate of competency under the above statute; of surplus allotment of noncompetent adult; by such heirs of lands allotted to noncompetent adult heirs (deceased dying intestate August 3, 1907, before selection of land); of surplus land, by noncompetent devisee; by a white nonmember of the tribe who was grantee under warranty deed from devisee of sole heir of land allotted to said heir as heir of Indian dying before June 28, 1906 (deceased, heir and devisee all being noncompetents and devisee receiving under will approved by Secretary providing "all devises of real estate made hereunder, are made subject to the condition that the real estate shall not be incumbered or alienated, without the consent of the Secretary of the Interior"). It found to be valid, leases executed by a guardian duly appointed by the county court, such leases being duly approved by the county court, on lands of minor allottees, and declared a certain lease would have been valid had it been made by a duly appointed administrator of surplus land allotted to decedent.

As to certain lands held in common the decree found as follows: (1) That where the lease was upon land inherited from allottee by his father, to whom a certificate of competency had been issued, and by his mother, to whom no such certificate had been issued, and the father thereafter had lost his interest through foreclosure of a mortgage placed by him thereon and the purchaser thereunder and the mother had executed a lease that the lease was valid as to the interest of the purchaser and void as to that of the mother; (2) that where the land of an infant allottee descended to his father, a noncompetent,

and to his mother, a white nonmember of the tribe, and the father acquired by purchase the mother's interest from her grantee, and subsequently leased the entire land, the lease was valid as to the interest coming through the mother and invalid as to that descending to the father; (3) that where lands descended from a noncompetent allottee to five heirs, three of whom were noncompetent (one having since died and his estate being in administration) and two had received competency certificates before the inheritance; and the estate had been administered and partition proceedings in progress; and the competent heirs had conveyed their interests to appellants; that appellants were enjoined from leasing the interest of the noncompetents or "from occupying or using the premises, or any part thereof, without the approval of the Secretary of the Interior"; (4) that where land descended from a noncompetent allottee to three heirs, two of which are noncompetent and one a nonmember of the tribe (lacking enrollment, though apparently a son), and thereafter through the death of the latter his interest descends to one of the other of the above two heirs, his mother, and she sold this latter interest to appellants who occupy and use the land with her consent, the other heir being a minor; that appellants are the owners of the one-third interest purchased but are enjoined from "in any manner occupying or using the said lands, or any portion thereof, or from inclosing same, or in any manner dealing with said lands, or any part thereof, without the consent of the Secretary of the Interior, or without procuring a lease upon the undivided one-third [two-thirds?] interest which is restricted."

The decree also found that there was no duty on the part of the government to protect from trespass, not injurious to the freehold, land leased in accordance with the rules and regulations of the Secretary of the Interior and upon which the lessee was paying the rental due. This was an instance of such land being adjacent to or surrounded by land belonging to appellants which had all been inclosed as a large pasture by an outside fence with no fence between this leased land and that of appellants; the trespass being by grazing cattle. The court denied a motion to dismiss the bill for defect in parties (in that the noncompetent Osage Indians were the real and sole parties in interest) and for lack of equity (in that no grounds for injunctive relief were stated and the existence of an adequate remedy at law by ejectment).

The various assignments of error cover all of the instances presented by the above statement. In their entirety they present for determination the broad questions of the powers and duties generally of the government in the protection of Osage Indian allottees and landowners and their lessees respecting agricultural and grazing leases and, in particular, the powers and duties of the Secretary of the Interior in that regard.

[1, 2] In dealing with tribal Indians in respect to severalty lands the United States has dual sources of authority. In the first place it may, as owner of the fee, impose such conditions as it sees fit in its grant to the Indian. In the second place it may, as the guardian of a people in a state of pupilage, impose such restrictions as seem advisable for the protection and welfare of such wards in the enjoyment or own-

ership of their land. The exercise of this latter authority in no way depends upon the former, but may operate where the land has passed from all restrictions of the grant. Brader v. James, 246 U. S. 88, 38 Sup. Ct. 285, 62 L. Ed. 591; Tiger v. Western Inv. Co., 221 U. S. 286, 31 Sup. Ct. 578, 55 L. Ed. 738.

As to instances of control through the grant of the lands it is established law (as stated in 14 R. C. L. 131) that:

"In making allotments of tribal lands the federal government has undoubted power to attach conditions to the grant, and it has exercised this power for the purpose of conserving the interests of the Indians by safeguarding the individual ownership of allottees through suitable restrictions designed to secure them in their possession and to prevent their exploitation, such, for example, as a prohibition against alienation for a specified period, or a requirement that an executive officer of the government shall assent to the execution of a conveyance."

Where the land is allotted in fee with no restrictive reservations, or where under the terms of the treaty or statute the land after restricted allotment passes from under the restriction, its ownership becomes untrammeled so far as governmental supervision extends, unless the allottee, or subsequent holder, is an Indian whose acts in respect to any land, or that character of land, are under governmental guardianship and as such controlled by law.

[3] The Osage Indians are recognized as maintaining a tribal organization, and their powers as to alienation of lands held in severalty are covered by the provisions of the Osage Allotment Act of June 28, 1906 (34 Stat. 539). As presented in this court and as found by the trial court the subsequent Act of April 18, 1912 (37 Stat. 86) concerned only two of the tracts of land here involved. In those two instances the act of 1912 did not affect the result reached by the trial court because one (the Wah-tsa-moie allotment) was a tenancy in common and the other (the Jack Wheeler allotment) was land subject to administration, but as to which there had never been any administration. Therefore the controversy is controlled by the Allotment Act of 1906 and what is herein stated refers to that act uninfluenced by later legislation. No opinion is ventured as to the effect of later legislation. That act provided (sections 2, 3, and 4) for the allotment of lands to the members of the tribe, subject to reservation to the tribe of all mineral rights therein for 25 years; the allotments to be divided into homestead and surplus lands; the homesteads to be inalienable until further congressional action and the surplus lands inalienable for 25 years, except that the Secretary of the Interior might grant to adults certificates of competency empowering them to convey their surplus lands and, after 25 years or the death of such allottees, their homesteads. As it would be impossible for such competent Indian to convey by deed after death, that part of the provision must be taken to mean testamentary disposition. It further provided (section 5) that at the expiration of 25 years "the lands, * * * shall be the absolute property of the individual members of the Osage tribe, * * * or their heirs, as herein provided, and deeds to said lands shall be issued to said members, or to their heirs, as herein provided, * * * and said members shall

have full control of said lands, \* \* \* except as hereinbefore provided." It then designated (section 6) the law to govern the descent of such lands. Section 7 provides for the use and control of such lands during the restriction period above designated as follows:

"That the lands herein provided for are set aside for the sole use and benefit of the individual members of the tribe entitled thereto, or to their heirs, as herein provided; and said members, or their heirs, shall have the right to use and to lease said lands for farming, grazing, or any other purpose not otherwise specifically provided for herein, and said members shall have full control of the same, including the proceeds thereof: Provided, that parents of minor members of the tribe shall have the control and use of said minors' lands. together with the proceeds of the same, until said minors arrive at their majority: And provided further, that all leases given on said lands for the benefit of the individual members of the tribe entitled thereto, or for their heirs, shall be subject only to the approval of the Secretary of the Interior."

Section 12 is:

"That all things necessary to carry into effect the provisions of this act not otherwise herein specifically provided for shall be done under the authority and direction of the Secretary of the Interior."

The purpose and policy of this act regarding these lands is clearly expressed. The mineral wealth is reserved for 25 years to the tribe under the strict control and protection of the Secretary, the proceeds thereof to be held in trust by him and distributed to the tribal members or their heirs. The surface is "set aside for the sole use and benefit of the individual members of the tribe, entitled thereto, or to their heirs" for 25 years from January 1, 1907. They are not to be diverted from this "use" by incumbrance or alienation except as to surplus lands of adults whom the Secretary has investigated and certified as competent to protect themselves in that regard, and except as to homesteads of such competent Indians which may be devised by them. To secure the full "benefit" to such Indians and their heirs they are permitted to fully control such lands for "farming, grazing or any other purpose not otherwise specifically provided for" in the act and to control the proceeds from such usage. They may accomplish this through leases, but, to prevent overreaching by lessees and the consequent partial or total destruction of the beneficial use designed by the act, the approval of such leases by the Secretary is required. The only exception to this last statement is in the case of those holding certificates of competency from the Secretary where it is provided that such persons "shall have the right to manage, control, and dispose of his or her lands the same as any citizen of the United States."

Applying this definition of the statute to the various sets of facts determined in the decree of the trial court there results the following: The approval of the Secretary is required to leases of lands held by minors or other noncompetents whether the land covered thereby came to such through allotment, descent, or devise, provided the land was allotted under the above statute. The circumstance that such lease was arranged by a parent, guardian, or administrator who might or might not be a nonmember of the tribe or a member competent to manage his own affairs or that the lease may have been approved by the state

county court is of no consequence because the statute specifically requires the protection afforded by the approval of the Secretary. The above application applies to all of such sets of facts except those of a lease by a competent allottee of his surplus lands or homestead and of leases by competents or nonmembers of the tribe who were tenants in common with noncompetents. As to the former the statute provides that the homestead cannot be alienated, but it seems clear that such competent Indian, through the "right to manage, control and dispose of his or her lands the same as any citizen of the United States," expressly given by the statute, can make such leases without the approval of the Secretary.

[4] As to instances where the land is held by tenants in common, part of whom are noncompetent and part competent or nonmembers of the tribe, a more perplexing situation is presented. Each of such tenants is, under the ordinary rules of tenancy in common, entitled to ingress, egress, and possession of the land and to a proper share of the benefits from the usage of the land. Such rights may be transferred by those legally capable of acting for themselves in such matters. But these considerations must bow to the requirements of the statute. Tenancy in common does not change a noncompetent into a competent Indian nor in any wise increase the power of such to deal with his interest in land so held. On the other hand, to permit the competent tenant to lease or use the entire tract or any undivided portion thereof, even though he accounted to the noncompetent tenant for his just portion, would completely obliterate that protection of supervision and approval which the statute carefully lodges in the Secretary alone. Therefore, the conclusion seems necessary that no lease of any part or interest in Osage Indian land held in common where one or more of such tenants in common are noncompetents can be made without the approval of the Secretary. Only through such a conclusion can the protection required by the statute be preserved. Apparent injustice to the competent or nonmember tenant cannot prevail against the statute, and such result is easily avoidable through the definite separation of land among the tenants through partition in accordance with the provisions of section 6 of the act of 1912 (37 Stat. 86).

[5] Another situation is presented by some of the above sets of facts and requires notice. That is where allotted lands have come through descent, devise or purchase to noncompetents from or through competents or nonmembers of the tribe. The provisions of section 2, par. 7, give full power of alienation of surplus lands to competents and make such subject to taxation. The homestead of such is made inalienable and nontaxable for 25 years "or during the life of the homestead allottee." These provisions show the legislative intention that all restrictions are removed from the surplus lands and, after 25 years or the death of the allottee, from the homestead. In short, that such restrictions do not follow the land into whosesoever hands it may pass. But this determination is not conclusive of the right of alienation or leasing by a noncompetent Osage Indian who may succeed to or acquire the title to such land. As stated earlier in this opinion the government, through its powers and duty of wardship over a people in

a state of pupilage, may protect them in the disposition of allotted lands coming to them without restriction. Such were the cases of Brader v. James, 246 U. S. 88, 38 Sup. Ct. 285, 62 L. Ed. 591, and Tiger v. Western Investment Co., 221 U. S. 286, 31 Sup. Ct. 578, 55 L. Ed. 738. The question is, therefore: Has the government retained its control over the disposition by noncompetent Osage Indians of Osage lands no matter from what source those lands came to such noncompetents? If such control is retained it must be found in the act now under consideration. The act contemplates the continuation of the tribal government; the supervision of the valuable mineral rights (retained in the tribe) by the government for 25 years; the holding in trust by the government of tribal funds for 25 years; the absolute inalienability by noncompetents for 25 years of surplus lands and of homesteads until further provision by law; the specific requirement that "all leases given on said lands for the benefit of the individual members of the tribe entitled thereto, or for their heirs, shall be subject only to the approval of the Secretary of the Interior"; the setting aside of these lands "for the sole use and benefit of the individual members of the tribe entitled thereto, or to their heirs as herein provided." In the Brader and Tiger Cases, the Act of April 26, 1906 (34 Stat. 137), which dealt broadly with the Five Civilized Tribes, was reviewed. Both that and the Osage Allotment Act were passed by the same session of Congress. The Supreme Court in those cases determined that the provisions of that law showed a Congressional intention to retain control over the disposition of lands by the class of Indians there involved. A comparison of those provisions, as discussed and construed in those opinions, with the provisions of the act here in question shows a similarity as to many of them and, in our judgment, a stronger situation here where there is dissimilarity. We, therefore, conclude that Congress intended to and did in this act retain for 25 years such control over the Osage lands of noncompetent Osage Indians from whatever source they were derived.

[5] Another question is whether the Secretary has authority under this act to prescribe and enforce rules and regulations and forms of leases respecting the leasing of lands of noncompetents. We read the requirement that such leases "shall be subject only to the approval of the Secretary of the Interior" to mean that they are valid only when approved by him. The Secretary acts in such matters as the protector of the Indians' welfare. He can withhold such approval for any reason that seems to him meritorious. These lands comprise many thousands of acres. It was to be expected, as has proved true, that upon so much land and over a period of 25 years there would be many hundreds of these leases presented for his approval. It would seem the most natural procedure for the Secretary to work out and make public the general requirements he deemed necessary for the protection of such Indians, and therefore for the procurement of his approval. Such would be a great saving to him in the convenient and speedy performance of his duties in this respect and a like saving of delay and uncertainty to those desiring to procure such leases. In fact, such a procedure would seem a necessity to the proper perform-

ance by him of such a trust. This action is expressly authorized by section 12, which is:

"That all things necessary to carry into effect the provisions of this act not otherwise herein specifically provided for shall be done under the authority and direction of the Secretary of the Interior."

[7] There remains for our consideration the determination of the trial court that the government was without authority to maintain an injunction to restrain the La Mottes from leasing or grazing land leased by the allottee to H. G. Ezell. The facts are that Ezell is the valid lessee under the approval of the Secretary; that he has paid the full consideration therein required to the allottee; that the La Mottes have not attempted to lease such premises; that their lessees of other adjacent lands owned or controlled by them permit cattle to pass on and graze the unfenced leasehold held by Ezell. Such trespass does not injure the freehold nor affect the allottee lessor. The wrong is to Ezell alone and he has a legal remedy and he alone. The government is not concerned in and has no authority to protect such interest of Ezell.

There is a clear ground of equitable interference by the government stated in the bill in that leases made contrary to the statute cast clouds upon the title which the government holds in trust for the Indians.

The order is that the decree be modified in accordance with the terms of this opinion, and, as thus modified, affirmed. The costs in the court below to be assessed against the La Mottes.