**OGDEN ELECTRIC CO. et al. v. ENGINEERS, Limited, et al.**

No. 3153.

Circuit Court of Appeals, Tenth Circuit.

Nov. 1, 1945.

Paul Thatcher, of Ogden, Utah (Ernest T. Young and Asa Bullen, both of Logan, Utah, and Roy D. Thatcher and LeRoy B. Young, both of Ogden, Utah, on the brief), for appellants.

Dan B. Shields, U. S. Atty., of Salt Lake City, Utah (John S. Boyden and Scott M. Matheson, Asst. U. S. Attys., both of Salt Lake City, Utah, on the brief), for appellees.

Before PHILLIPS, BRATTON, and HUXMAN, Circuit Judges.

HUXMAN, Circuit Judge.

This was an action to recover extra wages and taxes paid to electricians in the performance of the electrical work required in the construction of a government hospital at Brigham City, Utah, known as Bushnell General Hospital. A rather detailed statement of the facts is necessary to present the legal problems involved in this appeal. The plaintiffs will be referred to as the Electric Companies and the defendants as the Contractor.

On May 1, 1942, the government, through the War Department, entered into a fixed-fee construction-management contract with the Contractor for the construction of the Bushnell Hospital. The contract provided that the Contractor should furnish the labor, materials, tools, machinery, equipment, facilities and supplies not furnished by the United States, and management services necessary for the completion of the hospital, for which the government agreed to pay a fixed fee of $105,000 for their services. The performance of the contract was subject in all respects to the supervision, direction and instruction of the Contracting Officer of the government. The contract authorized the Contractor to enter into subcontracts with the approval of the Contracting Officer, but provided that in so doing the Contractor could not bind the government. The contract further provided that the Contractor should be reimbursed for such expenditures in the performance of the work as were approved by the contracting office, including expenditures for materials, labor, and subcontracts. The government reserved the right to pay directly to the subcontractors all sums due them for labor and materials under the subcontracts. The contract required the Contractor or any subcontractor to pay all mechanics and laborers compensation at wage rates not less than those determined by the Secretary of Labor, regardless of any contractual relationship existing between the Contractor, the subcontractor and the mechanics and laborers, and that all wage rates should be approved in writing by the contracting office. It further provided that all disputes arising under the contract should be decided by the Contracting Officer, whose decision should be in writing, subject to appeal by either party to the Chief of Engineers, whose decision was final and conclusive on the parties thereto.

On May 11, 1942, the Electric Companies entered into a subcontract with the Contractor in which they agreed to furnish all labor, materials, tools, machinery, and all other requirements necessary for the completion of the electric requirements at the hospital, subject to the general supervision of the Contractor, for all of which they were to receive a lump sum of $111,019.14 as their compensation. The subcontract recited that they had read and were familiar with the prime contract and with the respective rights and liabilities of the Contractor and the government thereunder. The subcontract provided that the Electric Companies should be paid directly by the government and that it was subject to renegotiation on written demand by the Secretary of War; and that any amounts found to represent excessive profits should be eliminated therefrom. A schedule attached to the main contract fixed the base rate of pay for electricians at $1.25 per hour. The Electric Companies were cognizant of this schedule and used this rate of pay in figuring the amount of their bid under the subcontract.

On May 26, 1942, after the Electric Companies had entered upon the performance of their contract, the District Engineer at Salt Lake City in charge of construction, received a teletype advising all interested parties that the rate of pay for electricians was raised to $1.50 per hour effective as of May 25. The teletype was signed "Chief of Engineers, by Captain Jacobs." All the parties to the subcontract were advised by the district office of the receipt of this teletype. The Electric Companies continued to pay electricians at the rate of $1.25 per hour. Representatives of the government returned their payroll or wage reports with a statement that the pay to electricians was too low and thereafter refused to accept their payroll reports until the wage was increased.

This increase in the wage rate was discussed with Captain Flandro, a United States Army officer in charge of the project, and with M. W. Lippman, project manager for the Contractor. The Electric Companies were ordered to put the increased wage rate into effect. This they refused to do until they had it in writing that they would be reimbursed for the difference. On August 10, 1942, Captain Flandro wrote the following letter to the Contractor: "Gentlemen: You are hereby instructed to notify your plumbing and electrical sub-contractors that as of May 26, 1942 they should pay their electricians and plumbers respectively $1.50 per hour for straight time." Upon receipt of this letter, on August 11, 1942, Lippman, project manager for the Contractor, wrote the Electric Companies the following letter:

"Gentlemen: 1. This is to notify you that as of May 26, 1942, you are to classify Electricians at $1.50 per hour, for straight time.

"2. On the completion of the Project, if definite evidence can be shown that you

figured your work at a lower scale, your Company will be reimbursed for the difference. The reason for delaying this action until the completion, is that a wage adjustment can be made at the same time as the re-negotiation audit. * * *

"Cahill Engineers, Limited,
"W. M. Lippman,
"Project Manager."

The authority of Lippman as project manager to represent the Contractor is clearly established.

Upon receipt of Lippman's letter the Electric Companies increased the wages retroactive to May 26, 1942. On December 9, 1942, the Electric Companies submitted a statement to the Contractor for the additional sums thus expended by them. This claim was approved by the Contractor's project manager and was sent in regular course to the government for payment. Payment was refused by the local pay-master and the claim was then submitted to the Comptroller-General, who likewise refused to pay the claim, holding that the United States was not liable. Thereafter, this suit was instituted against the Contractor to recover the amount of the claim. Judgment was rendered for the Contractor, and the Electric Companies have appealed.

The theory upon which this suit was instituted was, first, that the Electric Companies' contract was with the Contractor and that they looked to the Contractor alone for the payment of the amount due them thereunder, and, second, that in any event the Lippman letter was a separate and independent promise of the Contractor, supported by valuable consideration, in which the Contractor absolutely promised to pay this claim.

■ The record is not clear as to the place where the subcontract was signed, or where the Lippman letter was written. The brief of the appellant states that they were both executed in Utah. This statement is not challenged by the Contractor and we therefore conclude that both were executed in Utah. It follows that the law of Utah is controlling as to the rights of the parties.[1]

■■ Under the law of Utah, the purpose, the nature, and the subject matter, as well as the circumstances under which the parties were contracting, and the relations they sustained toward each other must be considered in construing a contract that is doubtful or uncertain in its meaning.[2] It is true that the subcontract named only the Electric Companies and the Contractor as parties thereto, and that the Contractor agreed to pay the consideration due thereunder. But the subcontract referred to the main contract. It specifically provided that the government would pay directly the labor and material claims arising thereunder. It further provided that it was subject to supervision and approval by the government's contracting officer, and that it was subject to renegotiation with the government as to any excessive profits. The Electric Companies also knew that the Contractor received a fixed fee for its supervision of the entire construction project, and that in fact the entire cost of the project was paid by the government.

While the Electric Companies submitted monthly estimates to the Contractor for sums expended for labor and material, these were merely audited and approved by the Contractor and then in turn were submitted to the Contracting Officer for the government, and when finally approved by the government were paid directly by the government to the Electric Companies. There is no evidence that the Contractor at any time paid the Electric Companies anything for their expenditures in the performance of the subcontract. All of this clearly indicates that the government was the real party in interest, and that the subcontract of the Electric Companies was in fact with the government, and that the parties thereto so understood the transaction.

■ It is also the settled law of Utah that the construction which the parties themselves place upon a contract will be given consideration when it becomes necessary to interpret the terms of the contract.[3] The conduct of the parties here clearly indicated that they considered and understood that the government was the real party to the execution of the subcontract. This is borne out by the addi-

[1] Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487.

[2] Schofield v. Zion's Coop. Mercantile Inst., 85 Utah 281, 39 P.2d 342, 96 A.L.R. 1083; Driggs v. Utah State Teachers Retirement Bd., 105 Utah 417, 142 P.2d 657.

[3] Minersville Reservoir & Irrigation Co. v. Rocky Ford Irrigation Co., 90 Utah 283, 61 P.2d 605.

tional circumstance that when the controversy over the increase of the wages arose, the Electric Companies went to Captain Flandro, who represented the government, and told him that they would go ahead with the raise "if you will give it to me in writing that you will reimburse me for the difference." Captain Flandro replied by telling them to go ahead and he would give it to Ogden in writing. Pursuant thereto, he wrote the letter of August 10 to the Contractor, instructing it to require the raise, and the Contractor, by Lippman, its manager, on August 11 thereupon wrote the letter upon which the Electric Companies predicate their second ground for recovery. Furthermore, when the contract was completed, the Electric Companies submitted their bill to the Contractor where it was approved by its manager and forwarded to the government for payment. When the government notified the Electric Companies of its refusal to pay the claim, they appealed to the Comptroller-General. Nowhere, up to this point, was there any intimation on their part that the amount claimed was due to them from the Contractor. It was only after they had exhausted their remedies against the government that they sought to hold the Contractor individually liable. It is our further conclusion that the parties to the subcontract, by their conduct toward each other, as well as toward the transaction in question, interpreted the contract as imposing the obligation for the payment of this claim upon the government.

But, the Electric Companies contend that in any event Lippman's letter of August 11 constituted an independent and absolute promise by the Contractor to pay the claim, and that such promise was supported by a valuable consideration. The Contractor, on the other hand, contends that Lippman was without authority to bind the Contractor in this respect, and that in any event there was no consideration for the promise. Without laboring the point, we think it is sufficient to say that in our opinion Lippman had such authority. For the purpose of what follows, we also assume, without so deciding, that there was valuable consideration for the promise. It is our conclusion, however, that when the letter is analyzed against the background of the entire transaction, as well as in the light of the conduct of the parties in relation to the claim, the letter does not contain an absolute promise on the Contractor's part to become individually liable for the claim and that the parties so understood it. The letter merely stated that at the conclusion of the project Ogden would be reimbursed providing it could be shown that the work had been figured at a lower scale. Nowhere did it state that the Contractor would make the reimbursement. We think it is quite clear that what was meant was that the government would adjust the matter. This conclusion is supported by that part of the letter which gives as a reason for deferring the matter until the completion of the contract that at that time the wage adjustment could be made as a part of the renegotiation of the contract. That could be had with the government alone. That the parties themselves placed this interpretation upon the letter is borne out by what has already been said with regard to the conduct of the Electric Companies in first seeking recovery of this amount from the government and only proceeding against the Contractor when they had completely exhausted their remedies against the government.

Affirmed.

PHILLIPS, Circuit Judge (concurring).

It is my opinion that, if Lippman's letter of August 11, 1942, could be construed as a promise of the Prime Contractor to reimburse the Electric Company for the additional costs resulting from the wage increase, such promise was without a consideration and nonenforceable. See McGovern v. City of New York, 234 N.Y. 377, 138 N.E. 26, 32, 25 A.L.R. 1442.