DeTAR DISTRIBUTING COMPANY, Inc., an Oklahoma corporation, L. F. Skaggs, Jr., and Goldie E. Skaggs, Appellants,

v.

TRI–STATE MOTOR TRANSIT COMPANY, a Delaware corporation, Appellee.

No. 8693.

United States Court of Appeals
Tenth Circuit.

June 8, 1967.

R. D. Hudson, Tulsa, Okl. (Thomas R. Brett, Tulsa, Okl., on the brief), for appellants.

Richard T. Sonberg, Tulsa, Okl., and Albert W. Thomson, Kansas City, Mo. (Houston, Klein & Davidson, Tulsa, Okl., and Linde, Thomson, VanDyke, Fairchild & Langworthy, Kansas City, Mo., on the brief), for appellee.

Before MURRAH, Chief Circuit Judge, LEWIS, Circuit Judge, and CHRISTENSEN, District Judge.

CHRISTENSEN, District Judge.

This is an appeal from a decree of specific performance of a contract for the sale of corporate stock and for the appointment of receiver, jurisdiction being founded upon diversity of citizenship and the requisite amount in controversy.

Goldie E. Skaggs, appearing with her husband as defendant in the lower court and as appellant here, was the owner of all of the outstanding capital stock of DeTar Distributing Company, Inc., co-defendant-appellant in this case. DeTar was a motor carrier which held contract carrier rights granted by the Interstate Commerce Commission. Prior to March 20, 1964, DeTar filed application with the ICC to convert these rights into common carrier rights. On the day last mentioned Mrs. Skaggs with the approval of her husband, L. F. Skaggs, Jr.,[1] entered into a contract with the Tri-State Motor Transit Company, appellee herein, to sell her DeTar stock.[2] At the time of

---

1. Mrs. Skaggs owned all the stock but Mr. Skaggs was made a party apparently by reason of some indication of joint control. Any question as to this is immaterial here.

2. "This Agreement, made and entered into this 20th day of March, 1964, by and between Goldie W. (E.) (LFS) Skaggs, party of the first part (herein called 'Mrs. Skaggs'), and Tri-State Motor Transit Co., party of the second part (herein called 'Tri-State')

"Witnesseth:

"Whereas, Mrs. Skaggs owns all of the issued and outstanding stock of DeTar Distributing Company, Inc., (herein called 'De-Tar') and Tri-State desires to obtain an option for the purchase of said stock which Mrs. Skaggs desires to give to Tri-State under the following terms and conditions:

"1. For and in consideration of the sum of Five Thousand ($5,000) Dollars paid by Tri-State to Mrs. Skaggs, the receipt of which is hereby acknowledged by Mrs. Skaggs, Tri-State is hereby given an option to purchase all of said DeTar stock from Mrs. Skaggs under the provisions of the paragraphs hereinafter set forth.

"2. The option must be exercised by Tri-State, if exercised at all, within ninety days of the date that DeTar's application for transfer from contract carrier to common carrier authority and the Interstate Commerce Commission is finally approved or denied.

"3. If the application for transfer to common carrier authority is finally approved, then the option price shall be an additional Thirty-Five Thousand ($35,000) Dollars. If the application for transfer to common carrier authority is finally denied then the option price shall be an additional Twenty-Five Thousand ($25,000) Dollars.

"4. Tri-State's obligation to pay the balance of the purchase price is dependent upon the approval of the Interstate Commerce Commission if the transfer to common carrier authority is finally approved. If the transfer to common carrier authority is finally denied, then Tri-State may assign this Agreement to a purchaser whose right to purchase is not subject to the approval of the Interstate Commerce Commission.

"5. The amount of the purchase price is based upon the balance sheet of DeTar at the time of the payment of the balance of the purchase price with assets equal to liabilities.

"6. DeTar shall not issue any more stock, or transfer any of its authorities, nor shall Mrs. Skaggs transfer or encumber the shares of stock of DeTar owned by her.

"7. If Tri-State fails to exercise the option herein granted to it, the Five Thousand ($5,000) Dollars paid to Mrs. Skaggs shall be retained by her.

this contract DeTar was in a bad financial condition. Thereafter its condition improved and when the time came for performance of the contract by Mrs. Skaggs, she refused, claiming that Tri-State had failed properly to exercise its option. Tri-State sued the Skaggs for specific performance.

■■ Both sides moved for summary judgment. These motions were heard in connection with Tri-State's motion for the appointment of a receiver upon depositions as well as evidence.[3]

The appellants took the position then, as here, that the contract on its face required the payment not only of the $5,000 which had been paid but an additional $35,000 in consideration of the granting of the option to purchase the stock, all of which the contract required to be paid within ninety days from the date DeTar's application for transfer from contract carrier to common carrier authority was finally approved or denied; that this latter sum did not represent the purchase price but was required additional consideration for the option; and that since the $35,000 was not paid within the period specified the option lapsed and the granting of specific performance for this reason was erroneous. Appellant also says that, "The total purchase price to be paid for the DeTar stock is not to be found in the entire contract except by speculation, surmise and interpretation." It was and is further contended that the provisions governing determination of the purchase price were so indefinite as to preclude specific performance in any event.

The appellee successfully contended, below, and maintains here, that a fair reading of the contract establishes as a matter of law that the $35,000 payment was not simply an additional consideration for the option but represented the balance of the purchase price agreed upon, subject to possible adjustment on the basis of DeTar's balance sheet at the time of payment; that all appellee was required to do in exercise of the option, the $5,000 having been paid, was to give notice of such exercise within ninety days of final approval of the common carrier status; that the balance of the purchase price did not have to be paid until the time of ICC approval of the transfer to it; that this approval had not occurred at the time of the court hearing by reason of the refusal of the appellant to co-operate in making application for such transfer; and that such refusal was in violation of the contract itself and necessitated the granting of equitable relief, including the appointment of a receiver.

■ We conclude that the court's interpretation of the contract is the correct one.

The following facts were without dispute:

The written contract for the purchase of the stock was executed on or about the date it bears and represented a considered agreement binding upon the parties. At the time of its execution Mrs. Skaggs received the agreed sum of $5,000 in consideration of which the appellee was "given an option to purchase all of said DeTar stock from Mrs. Skaggs under the provisions of the paragraphs" of the

---

"8. Mrs. Skaggs will cause DeTar to do all things necessary and proper for the conversion of DeTar from contract to common carrier authority and will co-operate with Tri-State in obtaining approval of the Interstate Commerce Commission to this sale."

3. The record is not entirely satisfactory with reference to the basis of the court's summary judgment. Whether evidence received on the question of receivership or preliminary injunction was intended to relate to the motion for summary judgment is not expressly indicated, although

by common acceptance this seems so. The record problem is compounded by the court's making "findings of fact" upon which to premise the "summary judgment". Manifestly, if findings on issues of controverted fact were essential, summary judgment was inappropriate. However, we have based this opinion upon the undisputed record, treating the "findings of fact" only as a statement of the reasoning of the court with respect thereto, and have tested the "conclusions of law" as against the uncontroverted evidential record in the light of the parties' contentions.

agreement thereafter set out. Mrs. Skaggs owned at that time, and continues to own subject to the contract, all of the outstanding stock of DeTar. On March 15, 1965, the ICC approved the application of DeTar to convert its authority from contract to common carrier, and on April 14, 1965, that order became final. Within ninety days from the latter date the appellee Tri-State communicated to the defendants notice of the exercise of its option. The ICC did not approve the transfer of the common carrier rights to the appellee prior to the commencement of this action on June 18, 1965 by reason of the appellants' refusal to cooperate in application for such transfer and their insistence that there was no such obligation on their part. In any event, within ninety days from April 14, 1965, to wit: On July 13, 1965, the $35,000 payment was tendered to Mrs. Skaggs in connection with this suit and was rejected. By its judgment the lower court required the plaintiff to pay the money into court.

The appellants have seized upon the contract designation of the $35,000 payment as the "option price" in an attempt to demonstrate that the $35,000 was not the balance of the "purchase price" contemplated by the parties and that this $35,000 had to be paid within the specified time to exercise the option. The construction is not justified by the contract and is inconsistent with its plain terms.[4]

Paragraph 1 designates the consideration for the "option" and further provides that such option contemplated the purchase of all of the outstanding DeTar stock on the terms thereafter provided in the contract. Although paragraph 7 expressly states that if the option is not exercised the Skaggs are to retain the $5,000 payment, there is nothing in the contract to suggest that the $35,000 is to be so treated. And manifestly it could not have been so provided consistently with the basic agreement, for it is clearly shown by other provisions of the contract that the later payment was not to be made until after the option actually had been exercised and the transfer had been approved by ICC.

Paragraph 2 provides that the option must be "exercised" within ninety days of the date that DeTar's application for transfer from contract carrier to common carrier authority is finally approved or denied. There is nothing in that paragraph which suggests that the exercise of the option was to be made otherwise than by notice [5] and certainly there is nothing to suggest that the $35,000 had to be paid as an additional consideration for the option and not as the agreed purchase price.

Paragraph 3 provides that if the application for transfer to common carrier authority is finally approved, the purchase price shall be "an additional Thirty-Five Thousand ($35,000) Dollars". It is true that in this paragraph such purchase price is referred to as the "option price". But in context such expression could refer only to the purchase price provided by the option.[6] A corre-

---

4. The appellants apparently confused acceptance or exercise of an option with performance. See Davenport v. Doyle Petroleum Corporation, 190 Okl. 548, 126 P.2d 57 (1942).

5. Notice under such circumstances is the accepted manner in which to "exercise" an option. Crane-Rankin Development Co. v. Duke, 185 Okl. 223, 90 P.2d 883 (1939).

6. Apparently this was Mr. and Mrs. Skaggs' understanding when they filed their original answer, for they then did not claim that the purchase price was other than or in addition to the $35,-

000. On the contrary, they admitted paragraph 4 of the complaint which alleged that, "Under the terms of said written contract, the balance of the purchase price to be paid by plaintiff to Mrs. Skaggs is $35,000.00 if DeTar could obtain approval" (of the transfer to common carrier authority), except that the defendants "specifically deny that the balance of the purchase price to be paid by plaintiff to the defendant, Goldie E. Skaggs, in the sum of $35,000.00 was paid or tendered within 90 days of the approval of the transfer. * * *" (Later this answer was amended to claim that the $35,000 was not the purchase price

sponding meaning attaches to the remainder of the paragraph providing that if the application should be finally denied then the option price (that is a price contemplated by the option) shall be an additional $25,000. This meaning is rendered doubly clear by paragraph 4 which provides that appellee's obligation to pay the balance of the purchase price is dependent upon the approval of the Interstate Commerce Commission.[7] Both under the law and by virtue of the contract, approval of the transfer to the appellee was required by the Interstate Commerce Commission and obviously unless such transfer were approved there would be no occasion or obligation to pay the balance of the purchase price, to wit: $35,000, if the common carrier status was approved and $25,000, if it was not approved. The authorities cited by appellant to demonstrate that in the exercise of an option time is of the essence notwithstanding the absence of an express stipulation to this effect are not germane since the option was exercised by notice within the time specified.[8]

Paragraph 7 of the agreement reinforces this view by providing expressly that if Tri-State fails to exercise its option the $5,000 paid to Mrs. Skaggs shall be retained by her. Obviously, if the additional $25,000 or $35,000 (depending upon approval or disapproval of the common carrier status) were to be paid in consideration of the option rather than as a purchase price, paragraph 7 would be paradoxical. In view of the other provisions, paragraph 7 assumes a usual and sensible meaning.

The appellants seek to make a further point that, under any interpretation, the contracted transfer of the stock required ICC approval and that this contingency in and of itself precluded the granting of specific performance. Specific performance, it is said, will not be compelled where the validity of the contract depends upon approval of a third party which has not been obtained when performance is sought. Indeed, some of the older cases cited by appellants express this rule without qualification. Hardy v. Deskins, 95 Okl. 108, 215 P. 738 (1923); Wichita Water Co. v. City of Wichita, 280 F. 770 (8th Cir. 1922). Cf. Ellis v. Treat, 236 F. 120 (9th Cir. 1916). None of these cases involves the type of problem or decree involved here. The applicable rule is reflected in The Restatement of the Law of Contracts § 359 and comment (b) thereunder, indicating that the mandatory order "may be conditional upon some performance to be rendered by the plaintiff or by some third person. * * *" The court's decree was so conditioned.[9]

---

but an "option" sum payable within the 90 day period mentioned.)

7. When approval by an administrative agency of a transfer is required by a contract, full payment of the purchase price ordinarily will not be required until such approval is secured. Lennon v. Habit, 216 N.C. 141, 4 S.E.2d 339 (1939). See also 77 C.J.S. Sales § 33 d, p. 654.

8. Cf. Anno. 72 A.L.R.2d 1127 (1960).

9. The decree conditioned performance "upon a final order by the Interstate Commerce Commission". The amended journal entry reads as follows:
"* * * B. Upon a final order by the Interstate Commerce Commission approving and authorizing the sale and transfer of all the issued and outstanding capital stock of DeTar to the plaintiff corporation, said defendants shall im-

mediately and forthwith endorse and deliver unto the plaintiff corporation, and transfer on the stock register of DeTar, said one hundred (100) [L.B. 2–15–66] shares of capital stock of DeTar free and clear from all claims or encumbrances whatsoever, upon payment by the plaintiff corporation to Goldie E. Skaggs, or to the Court Clerk for proper distribution, of the balance of the purchase price due under said written contract in the amount of Thirty-five Thousand Dollars ($35,000.00), plus the excess value of the assets of DeTar over its liabilities, as of the date of said I.C.C. order, as shown by the balance sheet of DeTar, excluding any value for its I.C.C. Certificate.

"It is further Ordered that the plaintiff corporation shall deposit with the Registry of the Court the sum of $35,-000.00, within ten (10) days from the

The appellants' argument that the latter part of paragraph 4 [10] is a permanent proscription against the assignment by appellee of any rights it might acquire by the contract since the common carrier authority was granted rather than denied, is not only a fallacious interpretation but one irrelevant to any point which was before the lower court or is before us. It does demonstrate, however, a rather persistent effort on the part of appellants on every conceivable front to avoid the contracted obligation, a determination which contributed doubtlessly to a belief on the part of the court below that the appointment of a receiver would be necessary to effectuate the purposes of the contract.

Paragraph 5 is the only part of the contract the meaning of which is not immediately apparent. It must be recognized that had not the purchase price been indicated clearly in the preceding provisions, the reference to its determination "based upon the balance sheet of DeTar at the time of the payment of the balance of the purchase price with assets equal to liabilities" could appear confusing or conflicting. Indeed, at the first reading this provision impressed us, as initially it did the trial court, as "just a bunch of words". Yet, considering the contract in its entirety and giving effect to all parts thereof,[11] and the relationship and circumstances of the parties at the time the transaction was entered into,[12] paragraph 5 assumes a meaning not inconsistent with the specification of the purchase price in paragraph 3 but of a natural and reasonable relationship.

The contract obviously contemplated the control of DeTar by the existing management pending application to, and approval of, the transfer by ICC and the payment of the purchase price, and at the same time envisaged a reasonably prompt and cooperative consummation of the transfer. Plainly both parties must have been familiar with the status of the business at the time the contract was entered into and with the fact that liabilities according to the balance sheet then substantially exceeded assets. We can see no purpose in paragraph 5, and none has been suggested by either party, other than to provide for the possibility of such a substantial change in the balance sheet of the company as to upset the basis on which the purchase price had been determined, that is, assets being no greater than the amount of liabilities as shown by the balance sheet. In such event, there would be at least an implied provision for an adjustment. Whether there was a corresponding implication that if liabilities exceeded assets at the time of transfer there should be a reduction in the purchase price involved the only real ambiguity and this was resolved by the trial court in favor of the appellants by foreclosing a reduction of the purchase price under all circumstances.[13] The

date hereof to be held pending final determination of the application to the Interstate Commerce Commission for approval of the sale of the DeTar stock to the plaintiff corporation. * * * "

10. "If the transfer to common carrier authority is finally denied, then Tri-State may assign this agreement to a purchaser whose right to purchase is not subject to the approval of the Interstate Commerce Commission."

11. In construing a contract, it should be considered in its entirety to determine the meaning and effect of each part. Frankfort Oil Company v. Snakard, 279 F.2d 436 (10th Cir. 1960), cert. denied 364 U.S. 920, 81 S.Ct. 283, 5 L.Ed.2d 259; United States for Use of Moseley v.

Mann, 197 F.2d 39 (10th Cir. 1952); Occidental Life Ins. Co. of Cal. v. Marmaduke Corbyn Agency, 187 F.2d 553 (10th Cir. 1951).

12. Which may be looked to in construing an unambiguous contract notwithstanding the parol evidence rule: Evensen v. Pubco Petroleum Corporation, 274 F.2d 866 (10th Cir. 1960); Restatement, Contracts § 235, comment e at 324 (1932); see also Williston, Contracts (3d Ed., Jaeger) § 629.

13. In this respect we believe the trial court was right also, for the purchase price had been fixed with knowledge that assets presently were far less than liabilities and the reason for the provision could be related only to such a substan-

lower court accordingly provided for the transfer of the stock upon the approval by ICC of the sale and the payment of "Thirty Five Thousand ($35,000) Dollars, plus the excess value of the assets of DeTar over its liabilities as of the date of said I.C.C. order, as shown by the balance sheet of DeTar, excluding any value for its I.C.C. certificate".

■ The appellants before the lower court did not, nor do they now, question this provision other than on the argument, rejected here, that the $35,000 was merely an additional consideration for the option and upon the further contention that in determining assets under paragraph 5, the actual value of the common carrier authority would have to be considered. The latter construction is negated by the manner in which the balance sheet of DeTar was kept, the practice and regulations under the Motor Carrier Act,[14] and the clear intendment of the contract itself which in paragraph 3 already had established the purchase price differential between the grant of authority and the denial of authority. If appellants were correct that the certificate value, aside from costs reflected in the balance sheet, should be included by virtue of paragraph 5 in completing the purchase price, the provision in the contract which so carefully spelled out the difference in consideration on the contingency of the approval or non-approval of the common carrier application would be rendered meaningless. Since this is the only basis on which the lower court's interpretation of paragraph 5 has been attacked, and appellants have suggested no other possible interpreta-

tion of the provisions, we find no reason to question further the judgment of the trial court on the matter. The controlling terms and conditions of the contract being thus clear, the rule so strongly relied upon by appellants that an ambiguous contract may not be specifically enforced does not apply.[15]

■ The final point urged on appeal is that the appointment of receiver constituted error. The appellants in this contention rely in their brief upon the single case of Mintzer v. Arthur L. Wright & Co., 263 F.2d 823 (3d Cir. 1959). This case recognizes the discretionary power under appropriate circumstances of a court to appoint a receiver in the exercise of its equitable jurisdiction but holds that the existence of some legally recognized right of the plaintiff in a defendant's property amounting to more than a mere claim against the defendant must exist as a prerequisite, in the absence of statute.[16] Here we have more than mere claims against a debtor as in *Mintzer*. The court had properly ordered the specific performance of the contract. The purchase price had been paid into court and it was unlikely that there would be any additional consideration under paragraph 5 of the contract, especially in view of the withdrawal of profits in salaries to family members. If so, provision was made in the decree for payment of the additional consideration before transfer would be required. All that remained as prerequisite to the vesting of complete ownership in appellee was this contingency and the approval of the transfer by ICC. This approval apparently could not be secured until an

tial change in existing conditions as to work a reversal of the assets-liability balance.

14. 49 U.S.C. § 316(h) provides that in proceedings to determine the justice or reasonableness of any sale, fare or charge of any carrier, "there shall not be taken into consideration or allowed as evidence or elements of the value of the property of such carrier, either good will, earning power, or the certificate under which such carrier is operating * * *."

15. See Joy v. City of St. Louis, 138 U.S. 1, 11 S.Ct. 243, 34 L.Ed. 843; Powell v. Moore, 204 Okl. 505, 231 P.2d 695 (1951). Cf. Gilroy v. White Eagle Oil Co., 201 F.2d 113 (10th Cir. 1952); Sohio Petroleum Co. v. Brannan, 205 Okl. 1, 235 P.2d 279 (1951).

16. Cf. Inland Empire Insurance Company v. Freed, 239 F.2d 289 (10th Cir. 1956); Kelleam v. Maryland Casualty Co., 312 U.S. 377, 61 S.Ct. 595, 85 L.Ed. 899 (1941). And see Skirvin v. Mesta, 141 F.2d 668 (10th Cir. 1944).

application was filed or consent was otherwise indicated by the management of DeTar for the transfer. The appointment of a receiver was merely a means to the end of carrying out the court's decree of specific performance. In view of the prior frustration of the purposes of the contract by appellants and their self-oriented control designed to affect adversely the value of the purchased stock as a result of their delay, we cannot say that the court abused its discretion in appointing a receiver. No question has been raised concerning the powers granted to the receiver aside from the propriety of the appointment itself, to which latter point we confine this part of our opinion.

Affirmed.

