390 F.2d 831
 Robert A. WHITEBIRD, George A. Romick, Phillip A. Romick, Jr., Woodrow Greenback, Lula May Greenback, Amy Greenback, Shirley Greenback Sixkiller, Charm Vallaire King and Walter King, Appellants,
v.
The EAGLE-PICHER COMPANY, a corporation, Appellee.
Pearl Crawfish PEERY, Thomas E. Crawfish, Alice Gilmore, Alice Marie C. Tuthill and Chester Woodard, Appellants,
v.
The EAGLE-PICHER COMPANY, a corporation, Appellee.
Ida Louise McQuillin KILLOUGH, Appellant,
v.
The EAGLE-PICHER COMPANY, a corporation, Appellee.
 Nos. 9303-9305.
 United States Court of Appeals Tenth Circuit.
 March 12, 1968.
 Rehearing Denied May 14, 1968.
 
 W. Rodney DeVilliers, Albuquerque, N. M. (W. L. Eagleton and James R. Eagleton, Tulsa, Okl., on brief), for appellants.
 John R. Wallace, Miami, Okl. (Ben T. Owens, Melvin H. Landers, Robert S. Gee, R. Bruce Carter, Miami, Okl., on brief), for appellee.
 Before WOODBURY,* LEWIS and HICKEY, Circuit Judges.
 HICKEY, Circuit Judge.
 
 
 1
 This is an appeal from a judgment of the trial court denying an accounting and recovery of additional royalty allegedly due appellants, Whitebird et al., under two consecutive sets of mining leases.
 
 The questions presented are:
 
 2
 Is Eagle-Picher obligated to account for and pay a royalty based upon its gross sales receipts from all minerals and mineral elements mined and sold from the leases under the 1922 and 1945 provisions?
 
 
 3
 Did the "Cincinnati litigation" compromise constitute an agreed interpretation of the 1922 leases?
 
 
 4
 Did the conduct of the parties who negotiated and executed the leases under the provisions of the law for the benefit of appellants operate to suspend or supercede regulations promulgated and effect an agreed construction of the royalty provisions?
 
 
 5
 Did Eagle-Picher acquire title to the minerals upon payment of the royalties required by the 1945 leases?
 
 
 6
 Appellants, Quapaw Indian wards of the United States Government, are the title successors of Indian lands allotted to members of the tribe in 1896.[1] Appellee is the successor to title of leases negotiated by the Secretary of the Interior pursuant to law, with approval of the owner-wards, covering portions of allotted lands in Ottawa County, Oklahoma, a part of the Tri-State Mining District where lead and zinc deposits are recovered by lessees. Eagle-Picher, or its predecessors, began mining operations in 1922 and has continued operations, with intermittent interruptions, until the present time. The basic mining operations have been conducted in substantially the same manner throughout the years. Crude ore is extracted from the mine, moved to a mill where lead concentrates, zinc concentrates and tailings are recovered from the crude ore. By additional processing at other plants zinc metal, cadmium, germanium, gallium, sulphur and sulphuric acid are recovered from the zinc concentrate. Only lead metal is recovered from the lead concentrate.
 
 
 7
 Two sets of leases are involved: The first, referred to as the 1922 leases, were negotiated and executed in that year with an expiration date of March 2, 1946; the second, referred to as the 1945 leases, were negotiated and executed in that year and are still in effect.
 
 
 8
 The 1922 leases provided for the payment of a 10% royalty "upon all ores mined and sold" from the leased land.
 
 
 9
 In 1937, appellants or their predecessors in title initiated litigation against Eagle-Picher in the United States District Court for the Southern District of Ohio (the "Cincinnati litigation"). The plaintiffs therein sought recovery for royalties allegedly due on the basis of 10% of the values recovered or recoverable as a result of Eagle-Picher processing lead and zinc concentrates at other plants and thereby producing some or all of the elements upon which claim is now made.
 
 
 10
 The Secretary of the Interior intervened on behalf of the plaintiffs and all persons similarly situated. The litigation was terminated by a stipulation executed by all parties on December 30, 1941. The stipulation dismissed the claim with prejudice, waived, relinquished and surrendered the plaintiff's claim to additional royalties based upon final sale prices of the elements recovered under the 1922 leases. Open market prices of zinc and lead concentrates, as and when they were produced at the mill, were accepted as the basis for the royalty computation. The stipulation was approved by the court and the Attorney General of the United States accepted the settlement and dismissed the action pursuant to the stipulation. The plaintiffs, appellants herein or their predecessors, accepted the proceeds of the settlement and compromise which were distributed pursuant to law.
 
 
 11
 The record contains considerable correspondence indicating the course the negotiations for settlement took. On October 14, 1941, the Assistant Commissioner of Indian Affairs of the Department of the Interior wrote the Superintendent of the Quapaw Agency advising him that a settlement of the "Cincinnati litigation" was being negotiated. The Assistant Commissioner's letter stated, in part:
 
 
 12
 "The tentative arrangement for settlement contemplates the Eagle-Picher Company making a payment of a lump sum which will not be allocated to the various claims made. It will be in full satisfaction of all existing claims against the company arising out of the leases in question. The Eagle-Picher Company objects to a settlement which would require it to pay a royalty on by-products such as sulphur and cadmium during the remainder of the term of the leases, on the ground it would serve as a precedent and other lessors in the Tri-State District would demand similar treatment. This Department is not willing to waive this claim. It therefore has been proposed that the company make an additional cash payment to compensate the Indians for the estimated royalties which might accrue to them during the remainder of the term of the existing leases. It is admitted that this is largely speculative but the company appears quite insistent that it would not accept a compromise involving any kind of a direct payment of royalties on by-products, or an admission that such payments are due under the leases. It is not believed this item alone should be permitted to defeat a settlement of the case if an otherwise satisfactory offer is received."
 
 
 13
 The letter further states, "There is a possibility of asserting the by-products claim against lessees other than the Eagle-Picher Company." Thus, it is clear the issue of whether royalties were due on by-products developed by Eagle-Picher was present in the negotiations from the very beginning and that the Department of the Interior would not assert any claim to royalties allegedly due on by-products if the company made an additional cash payment to compensate the Indians. Later correspondence indicates re-affirmance of Eagle-Picher's position on by-products and the acceptance of that position by the Department. Trial exhibit 1 was a letter dated November 5, 1941, to the Attorney General setting forth Eagle-Picher's stipulation for settlement. The letter states, in part:
 
 
 14
 "It is the intent that the dismissal of such claims with prejudice will terminate completely all controversy whether relating to past, present or to the remaining term of existing leases respecting accountability of the defendants for such by-products or alleged consumption or utilization of ores and concentrates."
 
 
 15
 Trial exhibits 2, 3 and 4 reflect the acceptance of this proposal by the Attorney General and private counsel. Trial exhibit 6 was an acknowledgment of receipt of the bank draft in the amount of the settlement price. The acceptance of the proposal bars any claims now presented under the 1922 leases. The findings of the trial court on this issue are sustained. The termination of the claims in the "Cincinnati litigation" by the Government was binding upon its wards. Mars v. McDougal, 40 F.2d 247, 249 (10th Cir. 1930).
 
 
 16
 The vital and primary issue concerning the 1945 hybrid mining leases[2] turns upon the interpretation of the language of the leases. It has been observed that today's leases are generally both a conveyance and a contract and, therefore, that it is "more likely that a written lease is intended to be a complete and operative integration of agreement. [Footnote omitted]." 3 Corbin, Contracts § 587, at 508 (1960). "Even when a contract has been fully `integrated' in the form of written words, those words never have a single, necessary, legally imposed meaning, unaffected by the other words and acts of the parties whether antecedent or subsequent. Those other acts and words are admissible in evidence, to discover both the meaning that one party intended and the meaning that the other party received." Id. § 538, at 71. Therefore, although evidence which will vary, alter or contradict the express written provisions of the written leases cannot be considered, American Crystal Sugar Co. v. Nicholas, 124 F.2d 477 (10th Cir. 1941), evidence which aids in the interpretation of the leases' language and indicates the meaning the parties intended and received may be considered. Evensen v. Pubco Petroleum Corporation, 274 F.2d 866 (10th Cir. 1960), cited in DeTar Distributing Co. v. Tri-State Motor Transit Co., 379 F.2d 244 (10th Cir. 1967); Colorado Milling & Elevator Co. v. Chicago, R. I. & P. R. Co., 382 F.2d 834 (10th Cir. 1967); Gibbs v. United States, 358 F.2d 972, 175 Ct.Cl. 411 (1966); Asheville Mica Company v. Commodity Credit Corporation, 335 F.2d 768 (2nd Cir. 1964).
 
 
 17
 All branches of the government seek diligently to recognize the fiduciary responsibility which the Congress has placed upon the Department of the Interior and its divisions to protect the rights of the Indian wards. Both agreements presented herein for interpretation were finalized by lengthy negotiations between the Interior Department and Eagle-Picher or its predecessors and were executed by the Secretary of the Interior for the benefit of the Indian wards and by the appellee. It is important to accept the proposition that the parties who negotiated and executed the agreements were Eagle-Picher and the Secretary of the Interior. "When two parties enter into a contract providing for the transfer of property or for conferring any other benefit upon a third party, interpretation should ordinarily be directed at determining the meaning given to the terms of the contract by the two parties who made it." Id. § 537, at 53.
 
 
 18
 The 1945 leases have the following royalty provisions: "A royalty of 10% of the sale price of all ore and concentrates produced and sold from said premises, said sale price for the purpose of determining royalty to be computed as in paragraph 2 hereinafter provided."
 
 Paragraph 2 provides:
 
 19
 "It is stipulated and provided that the sale price basis for the determination of the rates and the amount of royalty shall not be less than the highest and best obtainable market price of the zinc and lead ores and concentrates, at the usual and customary place of disposing of such ores and concentrates, at the time of disposition; and it is further stipulated and provided that the right is reserved to the Secretary of the Interior to determine and declare such market price, if it is deemed necessary by him to do so for the protection of the interest of the lessors."
 
 Sub-paragraph (e) of paragraph 2 provides:
 
 20
 "`Concentrates' is hereby defined to mean the marketable zinc and/or lead mineral as recoverable at the mill or concentrating plant where treated, including in addition to lead and zinc metal any and all other metals or elements contained in such concentrates."
 
 
 21
 In 1961 this court interpreted a royalty clause contained in a lease between non-Indian owners in the Tri-State Mining District and Eagle-Picher. Haynes v. Eagle-Picher Company, 295 F.2d 761 (10th Cir. 1961). The clause required the lessee to pay "`a sum of money equal to five (5) percentum of the market value at the place mined or produced of all oil, gas, asphaltum, lead, zinc and all other minerals or substances whatever, which may be mined or removed by the said party of the second part * * *.'" Id. at 762. The court interpreted the provision to include sulphur, cadmium and germanium, the elements, or part of them, on which appellants herein contend royalties are due.
 
 
 22
 We note at the outset that Haynes, supra, interpreted a dissimilar provision without having the benefit of evidence of the conduct of the parties which is present herein. In Haynes, the royalty provision demands a royalty for "all oil, gas, asphaltum, lead, zinc and all other minerals or substances whatever" [emphasis added] which were "mined or produced". In this case the parties provided for a royalty payment only on "all ore and concentrates" [emphasis added] produced. Thus, in Haynes when further processing resulted in the saving of sulphur, cadmium and germanium from the residue of the lead and zinc concentrates, it constituted production of "other minerals or substances whatever". However, when Eagle-Picher in the case before us, saved zinc metal, cadmium, germanium, sulphur, sulphuric acid and gallium from the zinc and lead concentrates, it did not constitute production of additional "ore and concentrates".
 
 
 23
 Trial exhibit 29 was a memorandum from James McKim, the district mine supervisor in the Geological Survey Division of the Department of the Interior, to H. A. Andrews, Superintendent of the Quapaw Indian Agency. The memorandum, dated January 22, 1942, contains recommendations with regard to lead and zinc mineral leases in favor of Eagle-Picher, and states the understanding of the Department with regard to concentrates. Paragraph 2, referred to above[3] is recognized as part of the 1945 leases, and the memorandum goes on to state: "The terms `ores and concentrates' is (sic) defined to include in addition to lead and zinc, all other values contained therein. This definition is inserted to prevent future lawsuits similar to the one in the past whereby the lessors sued for additional royalties covering cadmium and sulphur values." Exhibit 29 also refers to the fact that paragraph 2 had been "modified to include the stipulation of the sales price basis for the ore sold to agree with the supplemental stipulations approved for previous Eagle-Picher leases, with an added clause specifying the right of the Secretary of the Interior to waive the aforementioned stipulation." The Secretary has not waived the stipulation, and so far as we can determine from an exhaustive examination of the record, both the Secretary and Eagle-Picher have understood each other throughout the years in their interpretation of the leases. Thus, the conduct of the parties indicates they have placed a particular interpretation upon the 1945 leases and we feel it is a reasonable one. Restatement of Contracts § 235(e) (1932). "[T]he interpretative intendment of the parties to a contract is often best evidenced by their conduct in the execution of it. See Hardinge Co. v. Eimco Corp., 1 Utah 2d 320, 266 P.2d 494, citing 3 Williston on Contracts § 623. See also Ogden Electric Co. v. Engineers, Ltd., 10 Cir., 151 F.2d 657; Restatement Contracts § 235(e)." Utex Exploration Company v. Garwood, 246 F.2d 547, 551 (10th Cir. 1957).
 
 
 24
 The Restatement rule directs us to conclude that the trial court was not unreasonable in attaching the meaning to the manifestation that it did in the light of the evidence adduced with regard to the leases before it.
 
 
 25
 Affirmed.
 
 
 
 Notes:
 
 
 *
 Senior Circuit Judge of the First Circuit, sitting by designation
 
 
 [1]
 Whitebird v. Eagle-Picher Lead Co., 40 F.2d 479, 480 (10th Cir. 1930)
 
 
 [2]
 Swenson, Development Covenants in Solid Mineral Leases, 1 Natural Resources Journal 271 (1961)
 
 
 [3]
 Supra, at page 835