592 F.2d 1114
 Margaret Vivian SALMON, Calista J. Salmon and James D.
Salmon, Individually and as the heirs and Personal
Representatives of Martha Isabelle
Salmon, Deceased, Plaintiffs-Appellees,
v.
CITIES SERVICE OIL COMPANY, a corporation, and Shell Oil
Company, acorporation, Defendants-Appellees,
Cross-Appellants,
and
Gladys L. Snead et al., Interpleaded Defendants-Appellants.
 Nos. 77-1232, 77-1234.
 United States Court of Appeals,
Tenth Circuit.
 Argued Sept. 26, 1978.
Decided Jan. 29, 1979.
Rehearing Denied March 28, 1979.
 
 Richard I. Stephenson, of Fleeson, Gooing, Coulson & Kitch, Wichita, Kan. (Dale M. Stucky, Wichita, Kan., with him on the brief), for plaintiffs-appellees.
 Richard Jones, of Hershberger, Patterson, Jones & Roth, Wichita, Kan. (Robert F. LeBlanc, Sam Riggs, Jr., and Jack P. Grimaldi, Cities Service Oil Co., Tulsa, Okl., H. G. Bissonnet and F. H. Warner, Shell Oil Co., Houston, Tex., and Jack D. Sage, Hershberger, Patterson, Jones & Roth, Wichita, Kan., with him on the brief), for defendants-appellees, cross-appellants.
 Paul B. Swartz, of Martin, Pringle, Schell & Fair, Wichita, Kan., for interpleaded defendants-appellants.
 Before SETH, Chief Judge, and LEWIS and McWILLIAMS, Circuit Judges.
 SETH, Chief Judge.
 
 
 1
 The plaintiff commenced this action for an accounting and to recover additional royalty payments for a period from March 1966 to October 1969. The amount sought to be recovered is the difference between royalty paid to plaintiffs based on actual production from their tract, and the greater amount that they would have been paid in the aggregate had they joined a unit at the outset. Had they so joined they would have received royalty based on an allocation of unit production to what would have been, and later was, "their" tract, Tract 17 of the unit. The working interest owners are the defendants, and they interpleaded the lessors of all the other tracts in the unit.
 
 
 2
 The issue concerns the construction of the Unit Agreement and the Ratification Agreement. The question is whether the plaintiffs' late joinder entitles them to be considered as having participated in the unit from the outset as to the allocation of production under the Unit Agreement and royalty thereon.
 
 
 3
 The trial court found plaintiffs were entitled to an accounting, and the amounts claimed. It found that the interpleaded defendants had no claim as to the monies awarded plaintiffs, but did not determine in personam claims of interpleaded parties against the defendants. The unit operators have taken this appeal, and the interpleaded defendants have taken a cross-appeal.
 
 
 4
 The case was submitted to the trial court on stipulated facts together with depositions, exhibits to depositions, and interrogatories. In Aetna Casualty & Surety Co. v. Hunt, 486 F.2d 81 (10th Cir.), we considered the nature of our review in cases where the record is entirely documentary material. We there said:
 
 
 5
 "In a series of cases, this court has held that in the absence of oral testimony the appellate court is equally as capable as the trial court of examining the evidence and drawing conclusions therefrom, and that we are under a duty to do so . . ."
 
 We also there stated:
 
 6
 "In dealing with all such documentary evidence, the trial court is denied its normal advantage of an opportunity to judge the credibility of the witnesses, but the duty of this court to evaluate the facts does not extend to the making of an independent evaluation without regard to the findings below. Though this lack of opportunity to observe the witnesses establishes the appellate court's duty to evaluate documentary evidence in an equal capacity with the trial judge, we are loath to overturn the findings of a trial court unless they are clearly erroneous."
 
 
 7
 It appears that the Unit Agreement, which was for secondary recovery, became effective in March of 1966 and within fourteen months thereafter all the lessors except the plaintiffs had joined the unit. Also the record shows that two royalty owners who so ratified somewhat late were paid royalties based upon the unit's allocation of production to their tracts from the effective date of the unit up until their ratification.
 
 
 8
 The plaintiffs did not sign the Ratification Agreement until October 1969, some three years after the effective date of the unit, and they assert that they are entitled to royalties based on the unit allocation back to its effective date. Plaintiffs rely on a clause in the Ratification Agreement which recites that the lessors' benefits shall be:
 
 
 9
 "(T)o the same extent and with the same force and effect as if the undersigned (plaintiffs) had executed . . . the counterpart of said unit agreement with the other parties thereto As of the date thereof." (Emphasis added).
 
 
 10
 During all pertinent periods of time up to the execution of the Ratification Agreement by plaintiffs they were paid by Cities Service, who had the lease, royalties based on the Actual production from the well located on plaintiffs' land. Under the Unit Agreement there was allocated to this tract an amount of production greater than the actual production from the well on the lease. The amount that the allocated production exceeded the actual production was credited to Cities Service or Shell. Royalties computed on this excess were not paid to plaintiffs. Cities Service was, of course, obligated to pay royalties under its lease on plaintiffs' tract so long as it was not in the unit.
 
 
 11
 Under the Unit Agreement Production was allocated to each tract, there was no allocation of "royalty" or "royalty oil," and, of course, no fund established by the unit for royalty. Each lease owner under the Unit Agreement was responsible for the payment of royalty to the lessors of his tract who had joined the Unit computed on the production allocated to the tract. The unit as such had no responsibility or fund for royalty. If these lessors had not joined the unit the working interest owners were likewise responsible for royalty payments under the lease based on actual production. Since the working interest owners were in the unit, production was allocated to them for each tract within the unit area, and they were responsible separately for payment of royalty. The unit was effective, of course, whether plaintiffs joined or not.
 
 
 12
 As mentioned above, the trial court heard no witnesses as it took the case on the stipulated facts, on depositions and interrogatories, and considered some thirty-five or forty exhibits. The exhibits included the several agreements concerned, letters between the parties, and interoffice memoranda. Thus the entire background and circumstances which preceded the signing of the Ratification Agreement, and the position of the parties contemporaneously with the signing were considered by the trial court, and are in the record. We will thus take the case in the same way the trial court did, that is, with evidence of all the surrounding circumstances. See Colorado Milling & Elevator Co. v. Chicago, R. I. & P. Co., 382 F.2d 834 (10th Cir.), and Evensen v. Pubco Petroleum Corp., 274 F.2d 866 (10th Cir.).
 
 
 13
 Considering the correspondence between the plaintiffs and the defendant, and the testimony as to conversations between the parties, it is apparent that the plaintiffs understood before they signed the ratification that defendants would not make retroactive payments for the three-year period if plaintiffs joined. The record is perfectly clear that the defendants at all stages urged the plaintiffs to join the unit and demonstrated that it would be to their advantage to do so. This urging extended over a considerable period of time and included letters and several personal visits by defendants' representatives to the home of plaintiffs.
 
 
 14
 The record is also clear that the Cities Service advised plaintiffs before they signed that there was no suspense fund representing their tract or to which they were entitled.
 
 
 15
 The production from the unit as a whole which was allocated to the tract in question went to Cities Service, and out of this they paid royalties. This production so allocated, to the extent it exceeded the actual production from plaintiffs' tract, did Not represent production under the lease between plaintiffs and Cities Service. Thus it was not a change in the lease royalties or lease obligations as it was not related to the lease. Production under the lease was separately measured and accounted for and royalty paid to plaintiffs on such production.
 
 
 16
 The working interest as to Tract 17 was always in the unit and the unit was effective from the date stated therein. Tract 17 was qualified and was part of the unit at all times whether the royalty owners signed. The plaintiffs however made a choice to stay out, and to rely instead on the leases. This they did for over three years and their choice was fully recognized by defendants. The plaintiffs so made their decision and having made the choice, they are bound by it for the period here concerned unless the ratification otherwise provided.
 
 
 17
 From what has been mentioned above, it is apparent that plaintiffs were not misled in any way, and plaintiffs understood the position the defendant Cities Service was taking. There is some evidence to support an argument that plaintiffs should be estopped by reason of an acknowledgment as to the effective date, but we do not consider this to be a determinative point. It is however some basis for the position of the defendants that there was a meeting of the minds. This evidence consisted of the transmittal letter sent by Margaret Salmon with the executed ratification. This letter in part stated, " . . . we understand participation will be effective the month following the time you receive it." Of course, at that time Margaret Salmon knew that Cities Service's position was there would be no retroactive payment.
 
 
 18
 We have quoted the portion of the Ratification Agreement relied on by the plaintiffs. It is apparent, however, that the Ratification Agreement must be read with the Unit Agreement, as they both are part of the same transaction. See Bud Jennings Carpets & Draperies, Inc. v. Greenhouse, 210 Kan. 92, 499 P.2d 1096 (Kan.). The Unit Agreement provides that it becomes effective generally on a certain date, but it also provides that it becomes "binding" on each party when executed by such a party. The Ratification was of the Unit Agreement to which it refers, and can only relate to it as it was an election to be bound thereby for the first time. The Unit Agreement thus recites in Article 17.1: "This agreement shall become binding upon each party as of the date such party signs the instrument by which it becomes a party . . ." By the Ratification the signing party ratifies the Unit Agreement and expressly "does . . . become a party to, said Unit Agreement."
 
 
 19
 We must hold that when the clauses of both the Ratification Agreement and the Unit Agreement are read together, as they must be, the plaintiffs became a party to the Unit Agreement when they signed the Ratification. They were then bound by the provisions of the Unit Agreement, and all assumed the obligations thereunder. This included, on the plaintiffs' part, the right to receive royalty computed on the unit production allocated to Tract 17, and to be paid by defendants.
 
 
 20
 Under the Unit Agreement there is no basis for retroactive payments to plaintiffs based on unit allocation. Plaintiffs had relied on their lease provisions after having made a decision that it was in their best interests to do so. Under the instruments which they executed to change their position, they became "bound" and entitled to receive the benefits as provided in the Unit Agreement. This was as of the date upon which they signed the instrument by which they became bound.
 
 
 21
 There were royalty owners who signed some fourteen months after the Unit Agreement became effective, as mentioned above. These were paid additional sums equal to the royalty they would have received from the outset; however, this was a matter of discretion or judgment by the working interest owners there concerned, including defendants. We don't know what factors or considerations went into such transactions, and they are not significant in the construction of the instruments between the parties here concerned. This was not an interpretation by the parties as considered in Ogden Electric Co. v. Engineers, Ltd., 151 F.2d 657 (10th Cir.), nor contemplated by Restatement, Contracts, § 234(e), nor referred to in Whitebird v. Eagle-Picher Co., 390 F.2d 831 (10th Cir.).
 
 
 22
 We agree with the position taken by the trial court that the interpleaded defendants have been paid by defendants for all production allotted to their tracts, and they had no claim to the interpleaded fund. We also conclude that there was no basis whatever for a claim for punitive damages. Further, as the trial court held, there was no jurisdiction for an in personam judgment against the defendants for the interpleaded parties.
 
 
 23
 We have considered the documents and stipulations which were before the trial court and must conclude that the trial court should have entered judgment for the defendants.
 
 
 24
 Thus the judgment is reversed insofar as it gave relief to the plaintiffs, but is affirmed as to the interpleaded defendants.