Myra HAYNES, Pearl Garrett, Beatrice Thompson and Glenn Barr, Appellants,

v.

EAGLE-PICHER COMPANY, a corporation, Appellee.

No. 6736.

United States Court of Appeals Tenth Circuit.

Oct. 13, 1961.

Rehearing Denied Nov. 16, 1961.

Douglas Hudson, Fort Scott, Kan., for appellants.

John R. Wallace, Miami, Okl., for appellee.

Before MURRAH, Chief Judge, and PHILLIPS and HUXMAN, Circuit Judges.

MURRAH, Chief Judge.

This is an appeal from a judgment of the trial court denying recovery of additional royalty allegedly due the plaintiff-appellants under a mining lease.

Plaintiffs are the present owners of an undivided one-half interest in a quarter section of land in Kansas. In 1912 the predecessor of the plaintiffs executed a lease to O. M. Youse for a primary term of ten (10) years which provided, inter alia, that "the privilege of operating shall continue as long as oil, minerals, or other substances of value can be produced in paying quantities." The material portion of the royalty clause of this lease provided:

"In consideration of which the said party of the second part hereby agree and bind himself, his executors, administrators, or assigns, or sublessees to pay or cause to be paid to the party of the first part their executors, administrators or assigns, at a sum of money equal to five (5) percentum of the market value at the place mined or produced of all oil, gas, asphaltum, lead, zinc and all other minerals or substances whatever, which may be mined or removed by the said party of the second part * * *."

By mesne conveyances (hereinafter more fully set out) defendant Eagle-Picher obtained the right to mine these premises, located in what is known as the Tri-State Mining District. The mining operations consist of bringing the ore bearing rock to the surface where it is run through a beneficiating or concentrating plant or mill, and zinc concentrates and lead concentrates are recovered from the crude ore. Contained in the concentrates are zinc, sulphur, lead, cadmium, germanium and other elements.

There is no market of any kind for the ore bearing rock or crude ores mined until they have been reduced to concentrates. There is an open market in the Tri-State Mining District for the commodities known as zinc and lead concentrates. Such market has been in continuous existence for a period of time beginning several years prior to the original lease.

A royalty, based upon the market value of the zinc and lead concentrates, as determined by the market price, was paid by Eagle-Picher and its predecessors to the plaintiffs and their predecessors as full royalty payment.

Subsequent to plaintiffs' acquisition of their interest, Eagle-Picher, utilizing advanced processing techniques, began saving commercially sulphur, cadmium and germanium out of the residue of the concentrates. No royalty was paid on these newly discovered mineral values. Plain-

tiffs, upon learning that minerals other than lead and zinc were being commercially saved from the ores taken from their property, demanded payment for the sulphur, cadmium and germanium under the royalty provisions of the original lease. Eagle-Picher refused to recognize any obligation under the contract to pay for these mineral substances. This suit involves the lessee's obligation under the royalty provision of the original lease to compensate the lessors for these newly found values.

The trial court held for Eagle-Picher and concluded: that plaintiffs have been paid all that was due them under the original lease; that plaintiffs are estopped from asserting that they have not been paid all royalties due them; that there is no privity of contract between plaintiffs and defendant, hence no basis for recovery; and, that there is no fiduciary relationship between plaintiffs and defendant.

Of course, if there is no privity between plaintiffs and Eagle-Picher, the case is at an end. A brief deraignment of the manner by which Eagle-Picher acquired its interest in the premises is essential to an understanding of the legal relationship of the parties.

An undivided one-half interest in the entire Youse lease was obtained by Eagle-Picher from the Commerce Mining and Royalty Company, who had held that interest as assignee of the original lessee.

The remaining undivided one-half interest in the leasehold estate is held by Eagle-Picher under two instruments, each of which cover an undivided one-half interest in a divisible portion of the quarter section. Each of these instruments had a primary term which expired prior to that of the original lease and each of which provided, as did the original lease,

that if production was being had in paying quantities on the terminal date of their primary terms, then the right to operate thereunder would continue so long as such production was maintained.[1]

Eagle-Picher takes the position that as to the undivided one-half interest which it obtained under the instruments relating to the divisible tracts it is a sublessee—hence without privity, and under no duty to account to the lessor. Plaintiffs urge the provisions of the original lease wherein the lessee bound "himself, his executors, administrators, or assigns, or sub-lessees" to pay the royalty reserved therein and argue that Eagle-Picher, even if a sub-lessee, is responsible under the terms of the original lease.

■■ A sub-lessee owes no obligation to the original lessor to comply with the covenants of the original lease because there is no privity—either of contract or estate—between them. See Tiffany, Law of Real Property, Vol. I, p. 201, Sec. 124; 32 Am.Jur., 342, Landlord and Tenant, Sec. 423; Thompson on Real Property, 1959 Replacement, p. 52, Sec. 1210; 52 C.J.S. Landlord and Tenant, § 529b (1), p. 341. It follows that the language of the original lease, purporting to bind any subsequent sub-lessees, did not and could not have that effect.

■■ It is well settled that a conveyance by a lessee of an estate less than his own, retaining a reversion, is a sublease, while a conveyance which operates to transfer the entire interest of the lessee is an assignment. See Tiffany, Law of Real Property, pp. 196–197, Sec. 123; 32 Am.Jur. 331, Landlord and Tenant, Sec. 392. The instruments relating to the divisible portions of the quarter section here in question were for primary terms expiring prior to that of the orig-

---

1. The habendum clause of one of the instruments used the same language employed in the original lease, while the habendum clause of the other instrument provided that the lessee agreed with his sub-tenant to "extend such lease so long as the terms thereof are fully complied with for any period of time first parties may have authority to so grant." The "authority to so grant" on the part of the lessee was derived from the original lease and was for so long as minerals or other substances were produced in paying quantities.

inal lease and reversionary interests were retained by the lessee-transferor. The primary terms of these instruments therefore conveyed sub-leasehold estates. However, the reversionary interests were, by the terms of the instruments, contingent upon the absence of production in paying quantities on the last day of their primary terms. The record shows that on such dates production was being had in paying quantities and the habendum clauses contained in the instruments became effective and operated to continue the right of the parties holding under such instruments to occupy and mine the premises so long as such production was maintained. The contingent reversionary interests which had been retained by the lessee were thereby extinguished and, from and after that time, the transferees of the lessee held the entire remaining interest of the lessee under the terms of the original lease, i. e., an estate whose duration was so long as minerals in paying quantities could be recovered.

Having thereby acquired all of the remaining estate of the lessee, privity of estate between the lessor and these transferees was complete and the parties holding under such instruments became, in fact and law, assignees. See Tiffany, Law of Real Property, Vol. I, pp. 196, 197, Sec. 123; 32 Am.Jur. 289, Landlord and Tenant, Sec. 313. When, subsequently, Eagle-Picher obtained the interests owned by these transferees, it replaced them as assignee under the original lease and thereupon acquired an estate in privity with the lessor-landowner as to the remaining undivided one-half of the Youse lease.

The net result of Eagle-Picher's acquisition of all of the interest by which it became the sole operator of the premises was to place it in the position of an assignee of the entire Youse lease with the obligation to comply with the royalty provisions contained therein. Indeed, Eagle-Picher, as did its predecessors, has at all times paid directly to the lessor-landowners a royalty at the rate and in the manner provided for in the original lease.

Eagle-Picher additionally contends that the undivided one-half interest in the original lease obtained by it from the Commerce Mining and Royalty Company merged with the undivided one-half interest in the fee which it later acquired. The short answer is that it is the one-half of the lessor's interest presently owned by the plaintiffs and not that which is owned by Eagle-Picher which is in controversy.

Having determined Eagle-Picher's duty to comply with the terms of the original lease, we turn to the interpretation of the covenants contained therein, and particularly those words which obligate the lessees to pay five per cent "of the market value at the place mined or produced of all oil, gas, asphaltum, lead, zinc and all other minerals or substances whatever, which may be mined or removed." Given a reasonable construction, we think this rather conventional language was intended to obligate the lessees to pay the lessors a five per cent royalty on all minerals produced and sold. It is undisputed that sulphur, cadmium and germanium are minerals and, while they may not have had any value at the place "mined," they had a very definite value at the place "produced" after having been mined and removed. The disjunctive reference to the term "produced" in the lease admits, we think, of no other interpretation than that the parties contemplated the possibility that the production of minerals might well be accomplished at places and times other than those of the actual mining operations. It is common knowledge that minerals are not separated from the earth in pure form and that, except in rare instances, some processing is necessary to render them marketable. Indeed, it is admitted in our case that processing, to the extent of reducing the crude ore to concentrate form, has always been necessary before any market value at all is attained. The market value so attained was based entirely on the zinc and

lead content of the concentrates and the payment of royalty out of the proceeds of the sale of these concentrates did not compensate the landowner for the additional minerals they contained. When further processing resulted in the saving of sulphur, cadmium and germanium from the residue of the concentrates, these minerals acquired a market value of their own. The conclusion must follow, we think, that having been "produced" [2] and having acquired an ascertainable value, the sulphur, cadmium and germanium were covered by the terms of the lease.

Eagle-Picher urges that the interpretation of the lease should conform to the custom and practice which existed for many years in the Tri-State Mining area of paying royalties only on the market value of the concentrates. Of course, the royalty provision of the lease in question is, in our view, clear and unambiguous and may not be changed or modified by proof of general custom. Even so, the custom and practice relied upon by Eagle-Picher does not supply a convincing reason for the interpretation it desires. The record shows that with the advent of commercial value in the cadmium, germanium and sulphur content of the ore, the mining leases issued in the Tri-State area contained in almost all instances, language specifically limiting the royalty obligation to a percent of the lead and zinc concentrate value. Prior to the change in these leases, the "concentrates" were the only product mined which had any "market value" and, therefore, while royalty payments based thereon fully satisfied the provisions of our lease under the conditions then existing, that practice did not eliminate the possibility— now a reality—that other "minerals or substances * * * mined or removed" would later acquire a "market value" and thereby be cognizable under the plain terms of the lease.

■ As to the trial court's conclusion that plaintiffs are estopped to assert their claim, an examination of the record shows that the evidence wholly fails to establish any knowledge of the essential facts on the part of the plaintiffs and their predecessors in interest necessary to establish this defense. See 19 Am. Jur. 634, Estoppel, Sec. 34; Chisholm v. House, 10 Cir., 183 F.2d 698.

For the reasons indicated, the judgment is reversed with instructions to enter judgment for the plaintiffs for the amount of royalties, upon proof thereof, remaining due to the plaintiffs under the views herein expressed.

---

2. The evidence showed that "(I)n the mining business when you say you produce something, that means you save it commercially."