**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 4, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JAMES E. GILMORE; TAMMY S.
GILMORE SPRINGER; JOANNA K.
STAND, individual owners in Indian trust
property,

       Plaintiffs–Appellants,

v.

CATHY J. WEATHERFORD, personal
representative of the estate of Joseph E.
Mountford, deceased; BINGHAM SAND
& GRAVEL COMPANY, INC., a foreign
corporation, KEN SALAZAR; KAREN
KETCHER; PAUL YATES,

       Defendants–Appellees.

No. 11-5025

---

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 4:10-CV-00257-CVE-PJC)**

---

Stephen Richard Ward (John L. Williams and Daniel E. Gomez, with him on the briefs),
Conner & Winters, LLP, Tulsa, Oklahoma, for Plaintiffs-Appellants.

Matthew Littleton (Ignacia S. Moreno, Elizabeth Ann Peterson, and Mary Gabrielle
Sprague, on the briefs), United States Department of Justice, Environment & Natural
Resources Division, Washington, DC, for Defendants-Appellees Ken Salazar, Karen
Ketcher, and Paul Yates.

Theodore Q. Eliot (Graydon Dean Luthey, Jr., with him on the briefs), Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., Tulsa, Oklahoma, for Defendants-Appellees Bingham Sand & Gravel, Co.

Barry G. Reynolds and Kelley Gilbert Loud, Titus Hillis Reynolds Love Dickman & McCalmon, Tulsa, Oklahoma, and Charles Wylie Chesnut, Chesnut & Chesnut, Miami, Oklahoma, filed a brief for Defendant – Appellee Catherine J. Weatherford.

---

Before **LUCERO**, **MCKAY**, and **GORSUCH**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

---

Decades of lead and zinc mining in northeastern Oklahoma have left behind piles of mine tailings, known locally as "chat," that now have value as fill and gravel. This case concerns two chat piles, the Sooner and Ottawa piles, which share a convoluted ownership history. Some of the chat in these piles is owned by descendants of members of the Quapaw Tribe who were deemed incompetent to manage their own affairs. These individuals hold undivided "restricted" ownership interests; that is, they cannot freely alienate their interests in the chat as a matter of federal law. Not all of the chat in the Sooner and Ottawa piles, however, is restricted. These piles are considered "comingled" because they contain both restricted chat and unrestricted chat.

Plaintiffs in this case are three restricted owners of chat in the Sooner and Ottawa piles. They allege that Bingham Sand and Gravel Co., Inc. ("Bingham"), an owner of unrestricted chat, has been removing tailings from the Ottawa pile without compensating

-2-

the restricted owners. Plaintiffs further claim that the Estate of Joseph Mountford (the "Estate") has sold chat from the Sooner pile to Bingham. Under plaintiffs' theory of the case, federal law prohibits the sale or removal of any chat from commingled piles without the approval of the Bureau of Indian Affairs ("BIA"). Despite numerous informal requests that the BIA halt chat removal by Bingham and the Estate (collectively, the "private defendants"), the agency has not done so.

Seeking to stop chat removal and obtain an accounting for the chat that has already been removed, plaintiffs sued the Secretary of the Interior and several BIA officials (collectively, the "federal defendants"), Bingham, and the Estate in federal court. Against the federal defendants, they asserted claims under the Administrative Procedure Act ("APA") and pled an accounting claim that they contend arises under federal common law. The district court dismissed these claims for failure to exhaust administrative remedies. Although it assumed that plaintiffs could plead a common law accounting claim outside the ambit of the APA, the court nonetheless required exhaustion as a matter of judicial discretion. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm that determination.

As to the private defendants, plaintiffs asserted claims for conversion and an accounting. Following dismissal of the federal defendants, the district court concluded it lacked jurisdiction over these claims. We reverse that holding. Plaintiffs' conversion claim rests on a substantial and disputed issue of federal law in which the federal government possesses a serious interest: whether BIA approval is required before

-3-

restricted Indian personal property may be sold.  Because we hold that the district court had jurisdiction over this claim, we reverse and remand for further proceedings.


**I**

**A**

In 1895, Congress confirmed the Quapaw Tribe's allotment of certain lands in northern Oklahoma to individual members of the tribe.  See Act of March 2, 1895, 28 Stat. 876, 907; see also United States v. Hallam, 304 F.2d 620, 622 (10th Cir. 1962) (describing allotment process).  These allotments were made inalienable for a period of 25 years.  Id.  At the end of that 25-year period, Congress lifted the restriction on alienation except as to lands held by 62 Quapaw members who were deemed incompetent.  Act of March 3, 1921, Pub. L. No. 66-359, 41 Stat. 1225, 1248-49.  The regulation of these restricted parcels has been extended indefinitely.  See Act of July 27, 1939, Pub. L. No. 76-235, 53 Stat. 1127, 1127; Act of June 25, 1970, Pub. L. No. 91-290, 84 Stat. 325, 325; Act of May 24, 1990, Pub L. No. 101-301, 104 Stat. 206, 207.   As a result, these lands feature a checkerboard pattern of restricted and unrestricted parcels.

Congress allowed for the leasing of Quapaw lands for mineral development, primarily lead and zinc, in 1897.  See Act of June 7, 1897, 30 Stat. 62, 72; see also Haynes v. Eagle-Picher Co., 295 F.2d 761, 762-63 (10th Cir. 1961) (describing lead and zinc mining practices in the "Tri-State Mining District").  Mining activity created the piles of mine tailings or chat.  See Holder v. Gold Fields Mining Corp., 506 F. Supp. 2d

-4-

792, 794-96 (N.D. Okla. 2007) (discussing the creation of chat piles); see also 40 C.F.R. § 278.1(b) (defining chat as "waste material that was formed in the course of milling operations employed to recover lead and zinc from metal-bearing ore minerals in the Tri-State Mining District of Southwest Missouri, Southeast Kansas and Northeast Oklahoma").

In the 1930s, the federal government permitted certain mining interests to remove chat from restricted Quapaw lands to extract minerals from the tailings at off-site mills. See Holder, 506 F. Supp. 2d at 795. However, the restricted Indian owners retained their proportional interests in the removed chat. Id. And because restricted chat was intermixed with unrestricted chat during the re-milling process, the chat piles at issue in this case—the Ottawa and Sooner piles—became "comingled"; that is, these piles now contain both restricted and unrestricted tailings. See id. A 2002 letter from BIA Acting Field Representative Dennis Wickliffe describes this ownership arrangement as follows: "Every interest, restricted and unrestricted, is undivided, and therefore, cannot be defined or described, except by partitioning the chat pile in proportionate shares. When you remove one grain of material, you move both restricted and unrestricted ownership."

In 1983, the Environmental Protection Agency declared a portion of the mining area a federal Superfund site. See Holder, 506 F. Supp. 2d at 796. The agency began formal remediation efforts to abate lead contamination in the area in 1996. See id. at 797. Although chat is now used as construction material, federal regulations restrict its use for federally funded projects. See 40 C.F.R. §§ 278.1 to .4; see also Criteria for the Safe and

Environmentally Protective Use of Granular Mine Tailings Known as "Chat," 72 Fed. Reg. 39,331, 39,336 (July 18, 2007) ("Certain uses of raw chat have caused threats to human health and the environment as a result of the concentrations of lead, cadmium and zinc present in the chat.").

To further complicate matters, the restricted ownership interests have been apportioned among the heirs of the original restricted Indian owners such that numerous individuals hold fractional shares. According to the BIA, Bingham owns 76.237% of the chat in the Ottawa pile, 78 restricted owners own 16.565%, and an unknown number of unrestricted owners hold 7.198%. Ownership of the chat in the Sooner pile is similarly dispersed. The BIA claims that the Estate owns 61.97583% of the Sooner chat, 34 restricted owners own 37.43667%, and an unknown number of unrestricted owners own the remaining 0.587%. Plaintiffs dispute the BIA's numbers.

**B**

Plaintiffs allege that Bingham began removing and selling chat from the Ottawa pile sometime in 2001 or 2002. They also claim that the Estate began selling chat from the Sooner pile to Bingham around the same time. Plaintiffs allege that this chat removal was not approved by the BIA and that neither Bingham nor the Estate has compensated the restricted owners for their interests in the removed chat. According to plaintiffs, the BIA requested that chat removal from the Sooner pile cease in 2002, but that the unauthorized transportation nevertheless continued.

The restricted owners claim that they requested an accounting of the removed chat

as well as other action from the BIA "on multiple occasions since at least 2005." One of the restricted owners, James Gilmore, avers that he brought the issue to the attention of the Superintendent of the BIA's Miami Agency approximately once a month since 2002. The BIA has attempted to broker an agreement between Bingham, the Estate, and the restricted owners. In 2002, a BIA Field Representative stated that the agency was "finalizing arrangements to assist restricted chat owners in selling chat." And in 2004, a Department of the Interior Field Representative set up a meeting between representatives of Bingham, the Estate, and several restricted owners. These efforts, however, were unsuccessful. In November 2005, counsel for several restricted owners formally requested that Department of the Interior Field Solicitor halt the chat removal and provide an accounting. The record does not indicate how the agency responded, but it is undisputed that the issue was not appealed up the administrative ladder. A 2010 affidavit from the Superintendent of the Miami Agency states that Bingham recently submitted another offer to the restricted owners, but that no BIA-approved contract is currently in place.

In April 2010, restricted owners James Gilmore, Tammy Gilmore Springer, and Janna Stand filed suit against Bingham, the Estate, and several Department of the Interior officials. They asserted six causes of action: (1) an accounting claim against the BIA; (2) a challenge under the APA, 5 U.S.C. § 704, seeking to compel agency action; (3) an accounting claim against the Estate and Bingham; (4) a conversion claim against Bingham; (5) a claim for injunctive and declaratory relief; and (6) a claim for attorneys'

fees.

The federal defendants moved to dismiss based on the plaintiffs' failure to exhaust administrative remedies. Although the district court acknowledged that exhaustion is not mandatory for non-APA claims, it concluded that exhaustion of even non-APA claims would be required in this case as a matter of judicial discretion and granted the motion. Having dismissed the federal defendants, the district court requested briefing as to whether the court possessed jurisdiction over the remaining claims against the Estate and Bingham. After that briefing was complete, the court held that it lacked jurisdiction over those claims and accordingly dismissed them. The plaintiffs now appeal.

## II

When a district court concludes that it lacks jurisdiction over a claim based on the plaintiffs' failure to exhaust administrative remedies, we review its conclusion de novo. See Forest Guardians v. U.S. Forest Serv., 641 F.3d 423, 430 (10th Cir. 2011). Because exhaustion of APA claims is generally required, see Darby v. Cisneros, 509 U.S. 137, 146 (1993), the parties devote substantial briefing to the question of whether plaintiffs' claims arise under the APA or common law. However, as the district court recognized, "in cases not governed by the APA, the doctrine of exhaustion applies as a matter of judicial discretion." United Tribe of Shawnee Indians v. United States, 253 F.3d 543, 550 (10th Cir. 2001). The district court accordingly assumed that certain claims arose under the common law but nonetheless determined that exhaustion should be required. We review the decision to require exhaustion in this context for abuse of discretion. See

-8-

Quarles v. United States ex rel. BIA, 372 F.3d 1169, 1171 (10th Cir. 2004).[1]

## A

Among various Department of the Interior regulations of "general application

relating to Indian Affairs" are the procedure and practice rules found at 25 C.F.R. §§ 2.8

& 2.9. See 25 C.F.R. § 1.3. The district court held that plaintiffs should have followed

the administrative process set forth in these regulations to exhaust their claims against the

federal defendants. The regulations provide that any "person or persons whose interests

are adversely affected, or whose ability to protect such interests is impeded by the failure

of an official to act on a request to the official, can make the official's inaction the subject

of appeal." 25 C.F.R. § 2.8(a). An aggrieved individual must "[r]equest in writing that

the official take the action originally asked of him/her," describing "the interest adversely

affected by the official's inaction." Id. If the official does not respond within a

prescribed timeframe or fails to respond to the applicant's satisfaction, the individual may

"file a written notice of appeal in the office of the official whose decision is being

_____

[1] Whether plaintiffs' claims arise under the APA or common law is also immaterial with respect to the sovereign immunity analysis. Under 5 U.S.C. § 702, the United States waives sovereign immunity as to actions "in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority." As we held in Simmat v. U.S. Bureau of Prisons, 413 F.3d 1225 (10th Cir. 2005), § 702's waiver of sovereign immunity "is not limited to suits under the Administrative Procedure Act." Id. at 1233; see also Hanson v. Wyatt, 552 F.3d 1148, 1173 n.11 (10th Cir. 2008) (Gorsuch, J., concurring) ("Section 702 is a waiver of sovereign immunity, but we have not treated Section 704 as a limit on that waiver." (citation omitted)).

appealed." § 2.9(a).

Although the record contains a letter sent from an attorney representing some restricted owners to a Field Solicitor in the Department of the Interior's Tulsa office, there is no dispute that plaintiffs did not avail themselves of the procedures set forth in 25 C.F.R. §§ 2.8 and 2.9. Accordingly, plaintiffs did not exhaust the procedures set forth in these regulations. See Jones v. Bock, 549 U.S. 199, 218 (2007) ("[T]o properly exhaust administrative remedies [litigants] must complete the administrative review process in accordance with the applicable procedural rules." (quotation omitted)).

Like the district court, we will assume that plaintiffs' accounting and equitable claims arise under the common law rather than the APA. Adopting this assumption, we nonetheless conclude that the district court appropriately exercised its discretion by requiring exhaustion. In United Tribe of Shawnee Indians we explained that "[e]xhaustion serves the twin purposes of protecting administrative agency authority and promoting judicial efficiency." 253 F.3d at 550 (citation and quotation omitted).

> As to the first of these purposes, the exhaustion doctrine recognizes the notion, grounded in deference to Congress' delegation of authority to coordinate branches of Government, that agencies, not the courts, ought to have primary responsibility for the programs that Congress has charged them to administer. Exhaustion concerns apply with particular force when the action under review involves exercise of the agency's discretionary power or when the agency proceedings in question allow the agency to apply its special expertise.

Id. (quoting McCarthy v. Madigan, 503 U.S. 140, 145 (1992)).

Although plaintiffs attempt to paint their case as a simple request for an

accounting that does not rely on any particular agency expertise, we disagree with this characterization. As the district court noted, the complaint sought various forms of relief, including orders requiring the Secretary to determine:

> (a) "the correct status of the restricted Indian title in the chat in the Sooner and Ottawa piles, as well as in the underlying trust land, including the legality of the various conveyances by which" the Estate claim an interest;
>
> (b) that "trust chat . . . lawfully cannot, and could not in the past, be conveyed to any party, including in fee (to non-Indian parties) except under controlling law and pursuant to the Secretary's trust obligations"; and
>
> (c) "that Indian trust chat may not be lawfully removed from the Sooner and Ottawa Piles" except in compliance with "environmental laws and directives" and in accordance with "agreements endorsed by the Restrict[ed] Owners and approved by the Secretary."

Plaintiffs thus seek to compel various agency actions that would affect numerous restricted owners and other individuals beside the plaintiffs in this action. Further, as the plaintiffs acknowledge in their complaint, the chat piles are also impacted by the Environmental Protection Agency's Record of Decision for Operable Unit 4 at the Tar Creek Superfund Site. See generally Berrey v. Asarco Inc., 439 F.3d 636, 640 (10th Cir. 2006) (discussing Superfund listing). Given the need to weigh numerous interests and potentially to consult with another agency, we agree with the district court that the BIA's expertise and its development of an administrative record would greatly assist in the disposition of this dispute.

**B**

Plaintiffs advance several arguments to challenge the district court's

determination.  First, they contend that the regulations at issue do not apply to their claims, relying primarily on a set of unpublished district court cases that allowed similar claims to proceed unexhausted.  In <u>Otoe-Missouria Tribe v. Kempthorne</u>, 2008 U.S. Dist. LEXIS 99548 (W.D. Okla. Dec. 10, 2008) (unpublished), a tribe demanded an accounting of certain non-monetary assets held by the BIA in trust.  In an order denying a motion to dismiss, the district court summarily concluded that "Defendants have failed to demonstrate that the administrative remedies they allege Plaintiff failed to exhaust are applicable to the issues in this case."  <u>Id.</u> at *13-14.  The court held that "nothing in that process would have even remotely addressed the relief Plaintiff seeks here," in an apparent reference to 25 C.F.R. §§ 2.8 and 2.9.  <u>Id.</u> at *14.  Plaintiffs also cite to <u>Tonkawa Tribe of Indians of Oklahoma v. Kempthorne</u>, 2009 U.S. Dist. LEXIS 21484 (W.D. Okla. Mar. 17, 2009) (unpublished), in which the court identified the regulations at issue, but stated without citation that plaintiffs' claims arose under "federal common law to which administrative exhaustion doctrines do not apply."  <u>Id.</u> at *15.  Lastly, in <u>Seminole Nation v. Salazar</u>, 2009 U.S. Dist. LEXIS 27836 (E.D. Okla. Mar. 31, 2009) (unpublished), the court simply cited the two previous cases to conclude that "the amended complaint in this case states plausible claims for relief outside the APA that are within the Court's subject matter jurisdiction."  <u>Id.</u> at *3.

To the extent that these cases suggest that non-APA claims never require exhaustion, this suggestion is incorrect:  "[I]n cases not governed by the APA, the doctrine of exhaustion applies as a matter of judicial discretion."  <u>United Tribe of</u>

Shawnee Indians, 253 F.3d at 550. Nor do we observe any textual basis to conclude that 25 C.F.R. §§ 2.8 and 2.9 would not apply to plaintiffs' claims. Plaintiffs allege that they are "person or persons whose interests are adversely affected, or whose ability to protect such interests is impeded by the failure of an official to act." 25 C.F.R. § 2.8(a). Under these circumstances, the district court possessed discretion to require exhaustion of §§ 2.8 and 2.9 as a prerequisite to filing suit.

Plaintiffs also contend that these regulations are not mandatory by their own terms because they state that an aggrieved individual "can make the official's inaction the subject of appeal." § 2.8(a) (emphasis added). By using the optional "can," rather than "shall," plaintiffs suggest that the regulations are rendered optional. But the optional "can" applies to the ability of an aggrieved individual to appeal—an individual is not compelled to appeal simply because she is aggrieved by agency inaction. Proper exhaustion, however, requires that a litigant "complete the administrative review process" before seeking judicial review. Jones v. Bock, 549 U.S. at 218.

Next, plaintiffs argue that exhaustion would be futile. Exhaustion is excused "when administrative remedies would be futile, when they would fail to provide relief, or when an agency has adopted a policy or pursued a practice of generally applicability that is contrary to the law." Urban ex rel. Urban v. Jefferson Cnty. Sch. Dist. R-1, 89 F.3d 720, 724 (10th Cir. 1996) (citation and quotations omitted). The futility exception, however, is a narrow one; to fit within the futility exception, a plaintiff must show that resort to the administrative process would be "clearly useless." McGraw v. Prudential

-13-

Ins. Co. of Am., 137 F.3d 1253, 1264 (10th Cir. 1998) (quotation omitted).

Plaintiffs argue that the BIA has "predetermined" that it will deny the relief they seek because the agency has resisted providing similar relief in the three district court cases discussed supra. See Otoe-Missouria Tribe, 2008 U.S. Dist. LEXIS 99548; Tonkawa Tribe of Indians of Oklahoma, 2009 U.S. Dist. LEXIS 21484; Seminole Nation, 2009 U.S. Dist. LEXIS 27836. However, this court has explicitly rejected the position that it is "futile to lodge an objection before an administrative body simply because the body has precedent which contradicts the party's position." Tinker AFB v. FLRA, 321 F.3d 1242, 1248 (10th Cir. 2002); see also C.E. Carlson, Inc. v. SEC, 859 F.2d 1429, 1439 (10th Cir. 1988) ("Although petitioners contend that raising a disparate treatment argument below would have been futile given the SEC's past response, that alone is not a sufficient ground for presuming futility."). As the Supreme Court explained in United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. 33 (1952), we require an individual to seek relief from an agency as a matter of "[s]imple fairness" even when the agency is unlikely to grant the relief requested because "courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice." Id. at 37. Requiring exhaustion of such claims allows agencies to take into account the specific facts of each matter, see Ass'n for Community Living in Colo. v. Romer, 992 F.2d 1040, 1044 (10th Cir. 1993), and to change course if appropriate.

Finally, plaintiffs argue that they are not required to exhaust claims that can be

-14-

characterized as arising under 5 U.S.C. § 706(1). That section permits a court to "compel agency action unlawfully withheld or unreasonably delayed." Id. Plaintiffs cite authority from other circuits suggesting that claims arising under § 706(1) are not subject to the APA's "final agency action" requirement. See Cobell v. Norton, 240 F.3d 1081, 1095 (D.C. Cir. 2001) (if "an agency is under an unequivocal statutory duty to act, failure so to act constitutes, in effect, an affirmative act that triggers 'final agency action' review").

We note that the "the judicial doctrine of exhaustion of administrative remedies is conceptually distinct from the doctrine of finality," Darby v. Cisneros, 509 U.S. 137, 144 (1993), and that plaintiffs have not cited any authority for the proposition that § 706(1) claims are free from the exhaustion requirement. One might argue that a plaintiff seeking to challenge agency inaction in the absence of regulations allowing for such a challenge would be excused from exhaustion. In this case, however, circuit precedent requires us to reject plaintiffs' position. In Coosewoon v. Meridian Oil Co., 25 F.3d 920 (10th Cir. 1994), the plaintiff filed suit to compel the Secretary of the Interior to cancel certain oil and gas leases. Id. at 924. The district court dismissed the suit for failure to exhaust administrative remedies and we affirmed. Id. Citing to 25 C.F.R. § 2.8, we noted that "the Secretary has instituted an administrative procedure by which a party may challenge the Secretary's inaction concerning a particular issue." Id. at 925.

Although we acknowledge that agency inaction or undue delay may occur within the administrative process, we have no need to consider the plight of a hypothetical plaintiff trapped in administrative limbo who cannot complete the appeals process as a

result of agency foot-dragging. It is undisputed that plaintiffs did not attempt to exhaust the complete administrative process set forth in 25 C.F.R. §§ 2.8 and 2.9. Further, as we noted in Coosewoon, the administrative process set forth in those sections sets various deadlines by which relief is deemed denied if the appropriate official fails to respond. See 25 C.F.R. § 2.8(b). Under these circumstances, we must reject plaintiffs' assertions that 5 U.S.C. § 706(1) claims are categorically exempt from the exhaustion requirement.

For the foregoing reasons, we affirm the district court's dismissal of all claims against the federal defendants.

## III

The district court initially possessed jurisdiction over this case under 28 U.S.C. § 1361 because plaintiffs named federal officials as defendants. Once it dismissed those defendants, however, there was no clear jurisdictional basis for the suit to proceed. After additional briefing, the court dismissed the claims against the remaining defendants. We review de novo a district court's dismissal for lack of subject matter jurisdiction. See Urban, 89 F.3d at 724.

## A

Plaintiffs urge us to hold that the district court possessed federal question jurisdiction over their accounting and conversion claims against Bingham and the Estate. See 28 U.S.C. § 1331 (granting jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States"). A case "arises under" federal law under two circumstances: "a well-pleaded complaint establishes either that federal law

creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." Empire HealthChoice Assurance, Inc. v. McVeigh, 547 U.S. 677, 690 (2006). Plaintiffs rest on the second half of this formulation. State law creates the actions for accounting and conversion asserted against the private defendants. See Fleet v. Sanguine, Ltd., 854 P.2d 892, 896 (Okla. 1993) (recognizing right to equitable accounting remedy from co-tenant); U.S. Zinc v. Colburn, 255 P. 688, 689 (Okla. 1927) (describing state tort of conversion). But plaintiffs contend that a substantial question of federal law is implicated by this dispute.[2]

---

[2] In their reply brief, plaintiffs also argue that federal common law creates their causes of action against the private defendants. The district court rejected this contention below, and plaintiffs did not contest that determination in their opening brief. Although plaintiffs argued that their accounting claim against the federal defendants was a cause of action created by federal law, this argument does not appear with respect to their claims against the private defendants. Plaintiffs quote Nicodemus v. Union Pacific Corp., 440 F.3d 1227 (10th Cir. 2006), for the proposition that a claim "arises under federal law if its well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." Id. at 1232 (quotation omitted). They urge reversal of the district court's jurisdictional ruling solely on the second prong, asserting that issues of federal law are substantial and disputed. In the jurisdictional section of their opening brief, the words "cause of action" do not appear. Nor does that submission cite Oneida Indian Nation v. County of Oneida, 414 U.S. 661 (1974), the case upon which they rested their federal common law argument both below and in their reply brief.

Because plaintiffs did not argue in the opening brief that federal law created their causes of action against the private defendants, we are denied briefing on this complex issue. Accordingly, we will enforce the rule that "a party waives those arguments that its opening brief inadequately addresses." Harsco Corp. v. Renner, 475 F.3d 1179, 1190 (10th Cir. 2007); see also United States ex rel. Ramseyer v. Century Healthcare Corp., 90 F.3d 1514, 1518 n.2 (10th Cir. 1996) ("Our duty to consider unargued obstacles to subject matter jurisdiction does not affect our discretion to decline to consider waived arguments that might have supported such jurisdiction."). We thus do not consider

Continued . . .

-17-

The "substantial question" branch of federal question jurisdiction is exceedingly narrow—a "special and small category" of cases. Empire, 547 U.S. at 699. The Supreme Court discussed this prong thoroughly in Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing, 545 U.S. 308 (2005). After the IRS seized and subsequently sold Grable's property, Grable sued to quiet title, arguing the IRS's seizure notice was invalid under federal law. Id. at 310-11. Although the quiet title action was created by state law, the Court allowed the case to proceed in federal court because the validity of the seizure notice—an issue controlled by federal law—was "an essential element of [Grable's] quiet title claim." Id. at 315.

The Grable Court nonetheless stressed that the "mere need to apply federal law in a state-law claim" will not "suffice to open the 'arising under' door." Id. at 313. Instead, "federal jurisdiction demands not only a contested federal issue, but a substantial one, indicating a serious federal interest in claiming the advantages thought to be inherent in a federal forum." Id. The contested federal tax issue qualified as "substantial" because proper notice under federal law was an element of the state law claim and the federal government has "a direct interest in the availability of a federal forum to vindicate its own administrative action." Id. at 315. In addition, the federal courts could entertain the issue "without disturbing any congressionally approved balance of federal and state judicial responsibilities." Id. at 314.

---

whether federal common law might create a cause of action against the private defendants.

Since Grable was decided, the Court has stressed that this branch of arising-under jurisdiction is a slim one. See Empire, 547 U.S. at 699. In Empire, the Court considered claims brought by a federal employee health plan administrator seeking reimbursement of funds it had provided to an enrollee following the enrollee's recovery in a state tort suit. Id. at 687. Plaintiffs argued that federal jurisdiction covered such claims because "reimbursement directly affects the United States Treasury and the cost of providing health benefits to federal employees" and the federal government possessed an "interest in maintaining uniformity among the States on matters relating to federal health-plan benefits." Id. at 688. Describing the dispute as "poles apart from Grable," the Court rejected plaintiffs' jurisdictional assertion. Id. at 681. In Grable, the Empire Court noted, the disputed federal-law question "presented a nearly pure issue of law, one that could be settled once and for all and thereafter would govern numerous tax sale cases." 547 U.S. at 700 (quotations omitted). The Empire claims, in contrast, were "fact-bound and situation-specific." Id. at 701. Although the Court acknowledged that the federal government "has an overwhelming interest in attracting able workers to the federal workforce, and in the health and welfare of the federal workers upon whom it relies to carry out its functions," it concluded that these interests did not warrant federal jurisdiction given that "[t]he state court in which the personal-injury suit was lodged is competent to apply federal law." Id. at 700 (quotations omitted).

**B**

**1**

We conclude that plaintiffs' accounting claim does not depend on any issue of federal law, substantial or otherwise. Plaintiffs contend that Bingham and the Estate have wrongfully removed chat without approval of the Secretary. But Oklahoma law recognizes that a cotenant may compel an accounting regardless of whether the cotenancy property is obtained by legitimate or wrongful means. See Ludey v. Pure Oil Co., 11 P.2d 102, 104 (Okla. 1931) ("A tenant in common receiving the common property, either wrongfully or by consent, holds it as trustee for his cotenant to the extent of the interest of the cotenant, who may compel an accounting." (quotation omitted)). To prevail on an accounting claim, plaintiffs needed to show that they were cotenants and that Bingham held possession of the cotenancy property. Id. In other words, the alleged wrongfulness of the chat removal is not an essential element of plaintiffs' accounting claim. See Nicodemus, 440 F.3d at 1232 ("A case arises under federal law if its well-pleaded complaint establishes . . . that the plaintiffs right to relief necessarily depends on resolution of a substantial question of federal law." (emphasis added, quotation omitted)).

It is true that federal law is tangentially related to plaintiffs' accounting claim because their ownership interest implicates federal law. But as the Court held in Oneida, "a controversy in respect of lands has never been regarded as presenting a [f]ederal question merely because one of the parties to it has derived his title under an act of Congress." 441 U.S. at 676-77; see also Grable, 545 U.S. at 316 n.3 (noting that federal

-20-

jurisdiction does not lie over all "suits involving rights to land acquired under a law of the United States," otherwise "every suit to establish title to land in the central and western states would so arise under federal law, as all titles in those [s]tates are traceable back to those laws" (quotation and alterations omitted)).

**2**

Plaintiffs' conversion claim presents a closer question. Under Oklahoma law, "[c]onversion is any act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein." Steenbergen v. First Federal Savings and Loan of Chickasha, Okla., 753 P.2d 1330, 1332 (Okla. 1987). In their complaint, plaintiffs allege:

> Contrary to federal law, Bingham has removed nearly all of the trust chat from the Ottawa Pile without approval by the Secretary or the BIA and without any compensation to the Restricted Owners. Bingham has therefore converted Indian trust property for Bingham's own use and profit.

Plaintiffs thus claim that the private defendant's removal of chat violated their property rights—and amounted to conversion under state law—because, and only because, the removal was conducted without approval from the Secretary, as required by federal law. That is, they contend that Oklahoma personal property law includes and incorporates the federal requirement for purposes of the conversion claim. To win under this particular theory of conversion, plaintiffs must show that the Secretary's advance approval is required under federal law and that this claimed right is among those recognized under Oklahoma personal property law.

-21-

Accordingly, the conversion claim "necessarily raise[s] a stated federal issue." Grable, 545 U.S. at 314. To determine whether an issue is "necessarily" raised, the Supreme Court has focused on whether the issue is an "essential element" of a plaintiff's claim. Id. at 315. At least at the motion to dismiss phase, we employ the standard "well-pleaded complaint" rule. A case might fail for any number of reasons, but jurisdiction "must be determined from what necessarily appears in the plaintiff's statement of his own claim in the bill or declaration, unaided by anything alleged in anticipation of avoidance of defenses which it is thought the defendant may interpose." Taylor v. Anderson, 234 U.S. 74, 75-76 (1914). Whether the Secretary must approve any and all removal of restricted Indian property as plaintiffs allege is an issue that "arises in [p]laintiffs' case-in-chief, not by way of defense." Nicodemus, 440 F.3d at 1235.

The district court declined jurisdiction because it concluded that the federal issue of secretarial approval is not contested, as required by Grable. 545 U.S. at 313. We cannot agree with this conclusion. As the federal defendants note in their brief, the Department of "Interior has never made a definitive decision on the issue of whether federal law in all circumstances prohibits an unrestricted owner from removing its fractional share of chat from a pile unless and until it enters into a contract with the restricted owners approved by the BIA." Bingham and the Estate, moreover, plainly disagree with the plaintiffs' contention that approval is necessary. Plaintiffs rely heavily on United States v. La Motte, which required secretarial approval for leases of certain Indian lands held in common in part by "noncompetents," 256 F. 5 (8th Cir. 1919), aff'd,

-22-

254 U.S. 570, and contend the same rule applies to the comingled restricted and unrestricted chat piles. But Bingham disputes the applicability of La Motte, arguing that the case is "inapplicable to separate personal property" and applies only to realty. The Estate likewise takes the position that the "status of Plaintiffs as restricted owners . . . is immaterial." Even absent these statements, plaintiffs' allegations that the private defendants have been removing chat without approval from the Secretary for years, if true, strongly suggests the private defendants do not deem secretarial approval to be required. We accordingly conclude that the federal issue asserted in this case is indeed disputed.

The determinative questions then are whether the federal issue is "substantial" and whether resolution of the issue in federal court would "disturb[] any congressionally approved balance of federal and state judicial responsibilities." Grable, 545 U.S. at 314. In Empire, the Court clarified the meaning of "substantial" in this context. It distinguished between "a nearly pure issue of law" that would govern "numerous" cases and issues that are "fact-bound and situation-specific." 547 U.S. at 700-01. The issue in this case falls closer to the former end of this spectrum. Whether the Secretary must approve the disposition of restricted Indian personalty is a legal question that does not appear to depend on the specific facts of a case, though we do not speak to the merits of such a claim here.

Moreover, a decision on that question would apply to a fair number of disputes. As discussed above, the chat piles in the tri-state mining district have generated a not

insignificant number of federal court cases.  See Tonkawa Tribe of Indians of Oklahoma, 2009 U.S. Dist. LEXIS 21484; Seminole Nation, 2009 U.S. Dist. LEXIS 27836; Otoe-Missouria Tribe, 2008 U.S. Dist. LEXIS 99548.  And much other Indian personal property is similarly restricted.  See, e.g., United States v. Rice, 327 U.S. 742, 746 (1946) (noting that dispute involved personal property "restricted under the laws of the United States" held by "restricted Indians and wards of the United States"); Smith v. Babbitt, 96 F. Supp. 2d 907, 915 (D. Minn. 2000) (plaintiff Indians "contend that the interest they seek to inherit constitutes an interest in restricted personal property"); Landman v. United States, 103 Ct. Cl. 199, 206 (1945) ("Title to personal property, other than clothing, etc., was taken on a restricted bill of sale in the name of the United States for the use and benefit of the" decedent Creek Indian).

In delineating the contours of substantiality, the Supreme Court also distinguished Grable, in which the issue was "centered on the action of a federal agency (IRS) and its compatibility with a federal statute," from the issue in Empire, which "was triggered, not by the action of any federal department, agency, or service, but by the settlement of a personal-injury action launched in state court."  Empire, 547 U.S. at 700.  Once again, the issue in this case resembles that in Grable rather than that in Empire.  In Grable, the legal relationship between two private parties would be determined by whether a federal agency had complied with its duty to the plaintiff.  545 U.S. at 314-15.  In the case at bar, the legal relationship between the parties turns on whether defendants satisfied their (alleged) duties to a federal agency; the merit of plaintiffs' conversion claim rests on the

allegation that defendants could not remove chat without first obtaining approval from the Secretary.

The involvement of the federal government in this dispute is a key factor. As explained in Grable, a "substantial federal issue" is one that "indicat[es] a serious federal interest in claiming the advantages thought to be inherent in a federal forum." 545 U.S. at 313. Such an interest is present here. Unlike the typical dispute between two private litigants, this action concerns the responsibilities that a private defendant owes to a federal agency. The federal government itself has a strong interest in determining whether private assets comingled with restricted Indian personalty can be disposed of without BIA approval regardless of the private parties' stakes in that issue. Although the federal defendants in this case did not brief the jurisdictional issue, they nonetheless take the position that plaintiffs' claims against the Estate and Bingham "present one or more federal law questions that can fairly be characterized as substantial and disputed." There can be little doubt that this dispute is far more material to the federal government than a typical conversion claim between private litigants.

In this sense, the suit at bar bears strong resemblance to that in Nicodemus. There, the plaintiff landowner asserted numerous state-law claims alleging that a railroad had exceeded the scope of its federally granted right-of-way. 440 F.3d at 1233-34. As in this case, the federal government itself had a "direct interest" in the dispute because "the United States has a reversionary interest in the lands when no longer used for their

designated purposes." Id. at 1236.[3]

Courts have also looked to whether the federal law issue is central to the case in conducting the substantiality analysis. In Smith v. Kansas City Tile & Trust Co., 255 U.S. 180 (1921), the Court "recognized federal-question jurisdiction because the principal issue in the case was the federal constitutionality of the bond issue." Grable, 545 U.S. at 312. And in Grable, the contested issue of federal law "appeared to be the only legal or factual issue contested in the case." Id. at 315; see also Gully v. First Nat'l Bank, 299 U.S. 109, 118 (1936) (federal question jurisdiction may hinge upon "the distinction between controversies that are basic and those that are collateral, between disputes that are necessary and those that are merely possible"). In comparison, when a state-law claim "involve[s] substantial questions of state as well as federal law," this factor weighs against asserting federal jurisdiction. Bender v. Jordan, 623 F.3d 1128, 1131 (D.C. Cir. 2010).

Whether the federal law issue in this case is central is not entirely clear at this

---

[3] We recognize that Nicodemus, which this court decided a few weeks before the Supreme Court handed down Empire, contains sweeping language regarding substantiality which, in light of the latter decision, may no longer be good law. See Nicodemus, 440 F.3d at 1236 ("A case should be dismissed for want of a substantial federal question only when the federal issue is (1) wholly insubstantial or obviously frivolous, (2) foreclosed by prior cases which have settled the issue one way or another, or (3) so patently without merit as to require no meaningful consideration." (quotation omitted)). However, this broad reading of substantial federal question jurisdiction doctrine was not necessary to the outcome of Nicodemus, and we do not rely on this statement here.

stage of the litigation. However, we do not read the complaint to allege that the private defendants have violated those property interests in the chat that exist only as a matter of state law.[4] Rather, we understand plaintiffs to allege that their state-law property rights in the chat include the federal requirement of advance BIA approval. In so alleging, plaintiffs have framed their state-law claim in such a fashion that they succeed only if they are correct that the defendants failed to meet federal requirements for removal. This is akin to Grable in which the plaintiff "premised [his] superior title claim on a failure by the IRS to give it adequate notice, as defined by federal law." Grable, 545 U.S. at 314-15. Although plaintiffs could lose their conversion claim without the court reaching the federal question, it seems that they cannot win unless the court answers that question. Thus, plaintiffs' "right to relief necessarily depends on resolution of a substantial question of federal law." Nicodemus, 440 F.3d at 1232 (quotation omitted, emphasis added). Although we acknowledge that this claim is close to the line, we conclude that the federal law question is "substantial" under these circumstances.

Finally, we must consider "whether resolution of the issue in federal court would

---

[4] In certain contexts, Oklahoma common law permits a cotenant to alienate personal property without the consent of the other cotenants. See Chaparral Energy, L.L.C. v. Pioneer Exploration, Ltd., 241 P.3d 1161, 1164 (Okla. Civ. App. 2010) (cotenant with working interest in an oil or gas well "has the right to develop the property and market production, subject only to the duty to account to other cotenants" and thus "under ordinary circumstances, the sale of gas to a purchaser by a cotenant without the consent of other cotenants is lawful and does not constitute conversion on the part of either the working interest cotenant or the purchaser"). We have not uncovered an Oklahoma case dealing specifically with chat cotenancy, and have no occasion to opine on whether Oklahoma courts would analogize chat to oil and gas.

-27-

"disturb[] any congressionally approved balance of federal and state judicial responsibilities." Grable, 545 U.S. at 314. The fact that Congress has not elected to provide a statutory right of action to plaintiffs is a thumb on the scale of dismissal. But as the Court stressed in Grable, the "absence of a federal private right of action [is] evidence relevant to, but not dispositive of, the sensitive judgments about congressional intent that § 1331 requires." Id. at 318 (quotation omitted). When exercising federal jurisdiction would "herald[] a potentially enormous shift of traditionally state cases into federal courts" the congressional decision not to provide a private right of action takes on heightened significance. Id. at 319. But when the exercise of jurisdiction will "not materially affect, or threaten to affect, the normal currents of litigation" federal question jurisdiction may be proper notwithstanding the absence of a federal right of action. Id. at 319-20.

We conclude that plaintiffs' conversion claim satisfies the latter criterion. Although claims that touch on restricted Indian personalty arise with some degree of frequency, as noted supra, hearing such claims in federal court "will portend only a microscopic effect on the federal-state division of labor." Id. at 315. Even rarer will be those cases that depend upon an issue of federal law that directly impact a federal agency. We further note that although Congress has not provided for a statutory conversion action for owners of restricted Indian personalty, many claims relating to Indian property arise under federal common law. See Nahno-Lopez v. Houser, 625 F.3d 1279, 1282 (10th Cir.

-28-

2010) (recognizing federal common law claim for trespass to certain Indian lands).[5]

Thus, congressional silence on this matter is less than deafening given the federal judiciary's somewhat unique role in crafting common law as to Indian property issues.

Considering the numerous factors set forth in Grable and Empire, and our own precedent in Nicodemus, we conclude that plaintiffs' conversion claim presents a substantial and disputed question of federal law sufficient to confer federal question jurisdiction under 28 U.S.C. § 1331. We accordingly reverse the dismissal of all claims against Bingham and the Estate because "if any one claim within Plaintiffs' complaint supports federal question jurisdiction, a federal court may assert jurisdiction over all the claims, including any alleged state-law claims, arising from the same core of operative facts." Nicodemus, 440 F.3d at 1235 n.8 (citing 28 U.S.C. § 1367).[6]

**IV**

For the foregoing reasons, we **AFFIRM** the district court's dismissal of plaintiffs' claims against the federal defendants. We **REVERSE** its dismissal of the claims against Bingham and the Estate and **REMAND** for further proceedings consistent with this

_____

[5] As discussed in n.2, supra, we do not decide here whether plaintiffs' claims against the private defendants are created by federal common law.

[6] Although we remand all claims against the private defendants to the district court, the propriety of exercising supplemental jurisdiction under § 1367 was not fully briefed to this court, and may be considered below. We also note that the federal defendants suggest that the claims against the private defendants should be stayed pending exhaustion of administrative remedies of the claims against the federal defendants. This too is a matter we leave to the district court to consider in the first instance.

opinion.